**Christopher William BROSKY, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–93–526–CR.**

Court of Appeals of Texas,
Fort Worth.

Jan. 11, 1996.

Rehearing Overruled Feb. 29, 1996.

Ward Casey, Fort Worth, for appellant.

Tim Curry, Criminal District Attorney, Betty Marshall, Charles M. Mallin, Asst. Chiefs, Appellate Section, Marvin Collins, Alan Levy, Asst. Crim. District Attorneys, Fort Worth, for appellee.

Before LIVINGSTON, BRIGHAM and DAUPHINOT, JJ.

## OPINION

BRIGHAM, Justice.

Christopher William Brosky challenges his conviction for engaging in organized criminal activity. *See* TEX.PENAL CODE ANN. § 71.02 (Vernon 1994 & Supp.1996).[1] After finding him guilty, a jury assessed punishment at confinement for forty years in the Institutional Division of the Texas Department of Criminal Justice and assessed a $5,000 fine. Brosky contests his conviction by bringing nineteen points of error, challenging: the trial court's jurisdiction; its failure to quash the indictment; its jury instructions; the

---

1. The legislature amended section 71.02 of the Texas Penal Code effective September 1, 1994. The subsections affected by the amendment are not material to Brosky's appeal.

constitutionality of the statute that he was prosecuted under; the admissibility of certain evidence introduced at trial; the corroboration of the accomplice witness testimony; and the trial court's denial of challenges for cause. Additionally, Brosky raises double jeopardy claims. We overrule all points of error and affirm the conviction.

## FACT SUMMARY

During June of 1991, Brosky, then sixteen years of age, and two of his friends, Josh Hendry and Trey Roberts, were active in white supremacist organizations and identified themselves as "skinheads," members of a particular segment of the white supremacist movement. On the evening of June 6, 1991, Brosky, Hendry, and Roberts met and began driving around in Hendry's 1965 Ford Mustang. Roberts brought with him a sawed-off shotgun, and Hendry placed it in the trunk of the car. The three had planned to go on a camping trip in Athens, Texas, but Hendry's father refused to give permission for them to leave that evening because of the lateness of the hour. The three then bought some beer and drove to a neighborhood park where they drank and listened to skinhead music espousing racial hatred. Eventually, they ended up at Hendry's mother's home, where they brought the gun into the house and continued drinking and talking.

Early on the morning of June 7, 1991, the conversation returned to the skinhead movement, and the three expressed disappointment that "it [was] going down" because skinheads were less active locally. Hendry testified that Roberts then suggested the three engage in a drive-by shooting and that Brosky did not try to dissuade them. Although Roberts never stated that the intended victim of the drive-by shooting should be an African–American, Hendry understood that to be the plan. The three left the house through Hendry's bedroom window. Hendry asked Roberts whether he could trust Brosky. Hendry testified that Brosky was Roberts's friend and that Hendry was looking for reassurance that Brosky wasn't a "narc" and could be relied upon for such an endeavor. Roberts assured Hendry that Brosky could be trusted and brought his shotgun as the

three departed. Sometime after 4 a.m., Hendry had Roberts and Brosky push his car out of the driveway so that Hendry's mother would not hear them leave.

Hendry drove the car, and the shotgun was on the floorboard behind him. Roberts, wearing a camouflage cap, was in the front passenger seat. Brosky, wearing a white Notre Dame baseball cap, was seated in the back of the sports car. Hendry drove to a neighborhood where he and his mother had briefly lived and where he thought the racial composition was predominantly African–American.

Hendry said that while driving on Carter Street in Arlington, he spotted a heavy-set white man, later identified as Steve Sloan, leaning against a truck. Hendry waved at Sloan as he drove by and turned right at the next stop sign. At that point, Roberts spotted an African–American man, later identified as Donald Thomas, and told Hendry and Brosky, "[T]here's a n-----." Roberts asked if anyone else saw Thomas, and Brosky answered affirmatively. Roberts then instructed Hendry to turn around because he wanted to "shoot the n-----" and Sloan, whom Roberts considered a "traitor" for associating with an African–American. Hendry told Roberts to make sure that he shot both men because he did not want either to trace his license plate number.

Hendry said that he turned the car around and that Roberts got the gun out of the back seat. Hendry said he did not see Brosky hand Roberts the gun. According to Hendry, Roberts instructed him to slow down and give him time to pump the gun and fire twice. As the car slowed down, Brosky shouted "Shoot!" as Roberts fired one shot.

Sloan and Thomas were friends who worked the "graveyard" shift together at Quality Beverage in Grand Prairie. They had left work shortly before the shooting and had driven to a co-worker's home on Carter Street to socialize. Sloan saw an early-model Mustang pass by while he, Thomas, and the third co-worker were talking. All three men admired the car as it rolled by them. About ten minutes later, the Mustang reappeared, and Sloan saw a flash of fire and heard a shot ring out from the car. Sloan said he told a

fourth person who had come outside to call 911, and he got into his car to pursue the Mustang.

Hendry accelerated when Roberts indicated that he thought Thomas had been hit in the head. Brosky and Roberts told Hendry to slow down because he was driving "kind of crazy." As they came to a stoplight, they noticed Sloan following them and shouting "You are mine." Sloan confirmed that while chasing the Mustang, he shouted that their "a—— are mine, mother ——."

Sloan noted the Mustang's license number—BFK 85T—and managed to write it on the palm of his hand. He also observed a person in the back seat of the car wearing a white baseball cap. Hendry was concerned that Sloan had seen his license plate number and therefore wanted to shoot Sloan, but Roberts told Hendry not to worry. Hendry suggested chasing Sloan and saw Brosky hand Roberts the gun as they turned, maneuvered the Mustang behind Sloan, and began their pursuit.

During the chase, Hendry realized they were heading back toward the scene of the shooting, so he broke off the pursuit and headed back to his mother's house. Sloan said that after the Mustang broke off the chase, he drove back to the site of the shooting and found Thomas dead. Sloan gave the license plate number from the Mustang to the police officer who arrived at the scene as Sloan returned.

Hendry said that once they arrived at the house, he, Brosky, and Roberts climbed back into the Hendry residence through the bedroom window, and Hendry hid the shotgun under his waterbed. Later on June 7, 1991, Hendry drove Roberts and Brosky back to Roberts's home in Carrollton, Texas and then went to Hendry's father's house.

Arlington Police Detective Jorge Rosas, who was assigned to investigate the slaying, learned that the license plate number noted by Sloan belonged to a Mustang registered to a person named Glenn Babbit. Rosas eventually discovered Babbitt had sold the car to Charles Hendry, Josh Hendry's father. Rosas went to Charles Hendry's home to question Josh Hendry, but discovered that he was not there. While at the Hendry residence, Rosas learned Roberts's name and address and went to Roberts's apartment to question him.

Rosas explained to Roberts that he was investigating the killing and asked who else had been with Roberts in the Mustang. Roberts told Rosas that Brosky had been with Roberts since the previous evening and that Brosky was presently sitting outside Roberts's apartment near the pool. Rosas arrested Roberts and Brosky. Rosas took with him a white baseball cap that belonged to Brosky. Rosas later returned to the Hendry home and arrested Josh Hendry.

A Tarrant County grand jury indicted Brosky for engaging in organized criminal activity and conspiracy. Brosky was convicted of engaging in organized criminal activity.

## POINT OF ERROR ONE

■ In his first point of error, Brosky complains that, because the indictment alleged different conduct than that considered by the juvenile court when it waived jurisdiction, the 371st District Court was without jurisdiction to try Brosky.

In its original indictment, the State alleged in Overt Act # 10 that "William George Roberts III fired a shotgun at Donald Thomas." In its "Second Amended Petition Requesting the Juvenile Court to Waive its Jurisdiction," under section 54.02 of the Texas Family Code, the State alleged that Brosky and his confederates "performed an overt act as follows, to-wit: shoot said Donald Thomas with a deadly weapon, to-wit: a firearm." After a hearing on the certification to stand trial as an adult, the juvenile court entered an order waiving jurisdiction on the allegations set out in the State's Second Amended Petition. In a new indictment, the State then abandoned Overt Act 10 and added eight specific overt acts that had not been considered by the juvenile court in the Second Amended Petition. Brosky filed a Motion to Dismiss for Want of Jurisdiction, claiming that he was not certified as an adult for the conduct alleged in the new indictment. The State, in its reply, asserted that all of the specific criminal acts were the subject of a complete

investigation and hearing in the juvenile court.

The penal code requires an overt act by a defendant to find that he or she is guilty of "conspir[ing] to commit," TEX.PENAL CODE ANN. § 71.01(b) (Vernon 1994), and the Second Amended Petition, which formed the basis for the juvenile court's waiver of jurisdiction, alleged only one overt act by Brosky.[2] Brosky argues that the juvenile court waived its jurisdiction based on the allegation of an aggressive act[3] but that the jury was told it could convict Brosky after finding that he had committed any of the eight additional acts, including passive conduct,[4] alleged in the indictment issued after juvenile jurisdiction was waived. He relies on *Ex parte Allen*, 618 S.W.2d 357, 361 (Tex.Crim.App. 1981) (op. on reh'g) for his claim that the State acquired a transfer order relating to one criminal act of a juvenile and then sought indictment for a separate criminal act allegedly committed by the same juvenile.

The State concedes that a juvenile may not be tried as an adult for alleged criminal conduct where that conduct did not form the basis of the juvenile court's waiver of jurisdiction. But it maintains that the defendant may be indicted and prosecuted for all conduct arising from one incident where the transfer order relates to a specific criminal incident or specific acts constituting a crime. The State relies on *Allen* for the proposition that the only prerequisite to prosecution as an adult for alleged and related offenses is that the conduct resulting in the ultimate prosecution was the subject of a complete investigation and hearing in juvenile court.

The facts in the instant case are distinguishable from those in *Allen*, where prosecutors sought to have the juvenile court waive jurisdiction over the defendant accused of an attempted murder and a capital murder involving two different victims and allegedly committed four days apart. *Id.* at 358. In *Allen*, the only evidence presented at the certification hearing pertained to the at-

tempted murder charge, and the only order issued by the juvenile court waived jurisdiction over the attempted murder charge; however, the defendant was convicted of capital murder, and the attempted murder indictment was subsequently dismissed. *Id.* Here, the acts differ but all pertain to a scheme in which an African–American man was killed for racially-motivated reasons. Additionally, we note that a juvenile may be indicted in district court for all offenses that arise from the crime alleged in the certification petition. *See Castro v. State*, 703 S.W.2d 804, 805–06 (Tex.App.—El Paso 1986, pet. ref'd) (State permitted to prosecute burglary charge against juvenile certified as adult for offense of capital murder in connection with burglary); *Ludwig v. State*, 636 S.W.2d 869, 873 (Tex.App.—Waco 1982, pet. ref'd) (court held prosecution of juvenile for lesser-included offense permitted because prosecution directly flowed from same specific criminal incident).

The State's Second Amended Petition contained paragraphs alleging that Brosky shot Donald Thomas and alleging that Brosky agreed to and in fact did conspire to commit murder or aggravated assault. The order waiving juvenile jurisdiction included all of these allegations, which encompass the overt acts listed in the amended indictment. Brosky does not contest the State's assertion that all of the offenses alleged in the petition and the specific criminal acts were the subject of a complete investigation and hearing in the juvenile court. The juvenile court waived its jurisdiction after a hearing regarding all of the circumstances surrounding the early-morning of June 7, and we find no error in the State's substitution of overt acts in an indictment pertaining to the same criminal incident. Brosky's first point of error is overruled.

### POINTS OF ERROR TWO THROUGH FIVE

In his second through fourth points of error, Brosky complains that the trial court

---

2. The overt act alleged in the Second Amended Petition was that of shooting Donald Thomas.

3. The overt act alleged was that of shooting Donald Thomas.

4. Among the overt acts alleged in the revised indictment issued after juvenile jurisdiction was waived was the assertion that Brosky aided or assisted in pushing Hendry's car to the end of the street so as to not awaken Hendry's mother.

improperly denied his Motion to Quash the Indictment, which alleged that: paragraphs one through three of count one failed to allege that Brosky intended that murder be committed (point of error two); paragraphs one through three of count one tracked the provisions of the penal code, which were unconstitutionally applied to Brosky because they permitted conviction of conspiratorial conduct without proof of mens rea and without proof that Brosky intended that any offense be committed (point of error three); and paragraphs one through three of count one failed to allege a culpable mental state in connection with Brosky's alleged conduct, although the definition of the offense did not plainly dispense with any mental element (point of error four). In his fifth point of error, Brosky complains that the trial court's jury instructions, by tracking count one, paragraph three of the indictment, deprived Brosky of due process because the instructions authorized conviction for conspiracy to murder without requiring proof beyond a reasonable doubt that Brosky actually intended to cause the death of anyone.

The State maintains that Brosky failed to preserve error because he failed to obtain an adverse ruling on his Motion to Quash and relies on *Darty v. State,* 709 S.W.2d 652, 655 (Tex.Crim.App.1986) and *Peoples v. State,* 874 S.W.2d 804, 809–10 (Tex.App.—Fort Worth 1994, pet. ref'd). The State asserts that during the hearing on Brosky's Motion to Quash, the only ruling issued by the trial court concerned the amendment of the indictment. The State notes that Brosky sought to reurge his Motion to Quash but failed to obtain a ruling.

Count One of the indictment reads as follows:

Christopher William Brosky, hereinafter called Defendant, in the County of Tarrant and State aforesaid, on or about the 7th day of June 1991, did then and there with the intent to establish, maintain, and participate in a combination which included Christopher William Brosky, Joshua Hendry, and William George Roberts III as its members, who collaborated in carrying on said criminal activity, did conspire to commit the offense of murder and in further-

ance thereof the said Christopher William Brosky, Joshua Hendry, and William George Roberts III each performed one and more than one of the overt acts as described in the paragraphs labeled "overt acts."

Paragraph Two: And, it is further presented in and to said court, that the said Christopher William Brosky in the County of Tarrant and State aforesaid, on or about the 7th day of June, 1991, did then and there with the intent to establish, maintain and participate in a combination which included Christopher William Brosky, Joshua Hendry and William George Roberts III as its members, who collaborated in carrying on said criminal activity, did conspire to commit the offense of murder, to-wit: Christopher William Brosky, Joshua Hendry, and William George Roberts III did then and there agree among themselves, and with each other to engage in conduct that would constitute the offense of murder, namely to intentionally and knowingly cause the death of an individual, Donald Thomas, by shooting him with a deadly weapon, a firearm, and in furtherance thereof the said Christopher William Brosky, Joshua Hendry, and William George Roberts III each performed one and more than one of the overt acts as described in the paragraphs labeled "overt acts."

Paragraph Three: And, it is further presented in and to said court, that the said Christopher William Brosky, in the County of Tarrant and State aforesaid, on or about the 7th day of June, 1991, did then and there with the intent to establish, maintain, and participate in a combination which included Christopher William Brosky, Joshua Hendry and William George Roberts III as its members, who collaborated in carrying on said criminal activity, did conspire to commit the offense of murder, to-wit: Christopher William Brosky, Joshua Hendry, and William George Roberts III did then and there agree among themselves, and with each other to engage in conduct that would constitute the offense of murder, namely to intentionally and knowingly cause the death of an individual, by shooting that individual with a deadly

weapon, a firearm, and in furtherance thereof the said Christopher William Brosky, Joshua Hendry, and William George Roberts III each performed one and more than one of the overt acts as described in the paragraphs labeled "overt acts."

Count Two of the indictment read:

And, it is further presented in and to said court, that the said Christopher William Brosky, in the County of Tarrant and State aforesaid, on or about the 7th day of June, 1991, did then and there with intent that a felony, to-wit: murder, be committed, did agree with Joshua Hendry and William George Roberts, III that they would engage in conduct that would constitute said offense, namely, to intentionally and knowingly cause the death of an individual, by shooting that individual with a deadly weapon, a firearm, and the said William George Roberts, III, Joshua Hendry and Christopher William Brosky did perform one and more than one of the overt acts listed below in pursuance to said agreement, ...

Paragraph Two: And, it is further presented in and to said court, that the said Christopher William Brosky, in the County of Tarrant and State aforesaid, on or about the 7th day of June, 1991, did then and there with intent that a felony, to-wit: murder, be committed, did agree with Joshua Hendry and William George Roberts, III that they would engage in conduct that would constitute said offense, namely, to intentionally and knowingly cause the death of an individual, by shooting that individual with a deadly weapon, a firearm, and the said Christopher William Brosky did perform one and more than one of the overt acts listed below in pursuance to said agreement, ...

Brosky's Motion to Quash raised his concerns with both counts of the indictment. Specifically, he asked the trial court to set aside the charging paragraphs of Counts One and Two because they failed to allege an offense against Brosky with the degree of certainty to give him notice. Brosky asserted that paragraphs one and three of Count One and paragraphs one and two of Count Two failed to allege the specific acts of mis-

conduct and the manner and means employed and failed to identify the intended victim. Additionally, Brosky claimed that paragraphs one through three of Count One failed to allege that Brosky intended that murder be committed or that a death result. Brosky also maintained that paragraphs one through three of Count One failed to allege a culpable mental state. Brosky concluded his Motion by asking the trial court to set aside paragraphs one through three of Count One.

The State filed a response to the Motion to Quash responding to Brosky's concerns with Counts One and Two and then filed a Motion to Amend Count Two of the Indictment, adding language to paragraphs one and two, apparently in response to some of Brosky's concerns about the indictment's validity.

At the hearing on the Motion to Quash, the following exchange took place:

THE COURT: The Court will call Cause No. 0507810D, styled the State of Texas versus Christopher William Brosky.

Counsel for the State, Counsel for the Defense, the Court has received a number of motions filed by Defense Counsel in this case, and with that in mind, I would like to go down as many of these motions as I can today to get them out of the way prior to our scheduled trial.

I would like to go down the motions at this time to see if there are any agreements and proceed from there and I'll go down the order in which they are in the jacket.

The first one I have is—well, I have the State's Motion to Amend Count Two of the Indictment, and I believe that's in response to the Defendant's Motion to Quash the Indictment.

[PROSECUTOR]: Your Honor, the State would respectfully request the Court to amend Count Two, Paragraphs One and Two, as we have set forth in our motion. We have provided the Court with an appropriate order that would amend those two paragraphs of Count Two.

We believe that once the Court has granted our Motion to Amend, which we ask the Court to do today, that the Motion to Quash then is satisfied and taken care

of. I'm sure the Defense may disagree with that, but nevertheless, we do ask the Court to amend our indictment as we have set forth in our motion and as proposed in our order, which additionally sets forth the steps necessary to make a successful amendment to the indictment.

THE COURT: All right. [Defense Counsel], is there anything from the Defense?

[DEFENSE COUNSEL]: No, Your Honor. We just reurge the Motion to Quash in its entirety.

THE COURT: All right. Well, I'm going to grant the State's motion—relief to file and I don't see the order.

All right. There it is right there.

I will grant the order submitted by the State and order the State to amend their indictment, consistent with the order.

Keep in mind, gentlemen, that must be done immediately so there is no delay in the trial of the case because you are working against the clock.

That will be granted.

All right. The next one I find in the jacket is the plea in opposition to the special plea in jeopardy.

I want to reread the latest filing submitted by Defense Counsel in that case and I will let you know what my decision will be Friday.

The next is the Motion to Quash, and we have taken care of that.

Although Brosky raised concerns with both counts of the indictment, the State's Motion to Amend addressed only the concerns with Count Two. It is unclear whether the trial court thought that ruling on the State's Motion to Amend Count Two would cure all of Brosky's complaints with the indictment and whether the court intended to overrule the Motion to Quash in its entirety. But Brosky still had before the trial court issues pertaining to Count One that he wanted the trial court to decide.

"It is a long-standing rule in this State that absent an adverse ruling of the trial court, which appears in the record, there is no preservation of error." *Darty,* 709 S.W.2d at 655. By failing to obtain a ruling on the

portions of the Motion to Quash pertaining to Count One of the indictment, Brosky waived any error arising from Count One of the indictment. Points two through four are overruled.

In point of error five, Brosky faults the jury charge for including language from what he considered the flawed language of Count One. But not only did Brosky fail to preserve error on the challenges to the indictment during the hearing on the Motion to Quash, he failed to repeat those concerns when the trial court asked for objections to the jury charge. Point of error five is also overruled.

## POINTS OF ERROR SIX THROUGH EIGHT

■ Brosky next complains that section 71.02(a) of the Texas Penal Code as applied to Brosky is unconstitutionally vague because the term, "intent to ... participate in a combination" permits punishment for activity protected by the First Amendment because the statute does not require proof of intent to participate in the criminal activities of the combination (point of error six) and because it defines a "combination" as "three or more persons who collaborate in carrying on criminal activities, although: (1) participants may not know each other's identity; [and] (2) membership in the combination may change from time to time," which permits punishment for First Amendment protected activity (point of error seven). He also complains that those sections of the penal code, when applied to combinations engaged in legitimate political activity, as well as criminal activity, have a "chilling effect" on First Amendment protected activity (point of error eight).

Brosky asserts that the introduction of prior speech and associations were used to establish elements of the offense and objects to that portion of the penal code that allows for conviction even if the participants in the combination do not know each other or if membership in the combination changes over time. He asserts that although the State may have proved that Brosky had the intent to participate in a combination, specifically,

the world-wide skinhead movement, and that the combination included Hendry and Roberts as its members, the State failed to prove that Brosky knowingly participated in a conspiracy to murder or that he intended anyone to die.

The State counters that the First Amendment does not protect physical assaults, *Roberts v. United States Jaycees*, 468 U.S. 609, 628, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462, 478 (1984), and notes that a statute will not be declared violative of the First Amendment as overbroad because evidence of the defendant's prior speech or association is used to prove that the defendant intended to select his victim on account of race. *Wisconsin v. Mitchell*, 508 U.S. 476, —— n. 1, 113 S.Ct. 2194, 2197 n. 1, 124 L.Ed.2d 436, 442 n. 1 (1993).

The pertinent portion of the statute challenged by Brosky is:

(a) A person commits an offense if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, he commits or conspires to commit one or more of the following:

(1) murder, capital murder, arson, aggravated robbery, robbery, burglary, theft, aggravated kidnapping, kidnapping, aggravated assault, aggravated sexual assault, sexual assault, forgery, deadly conduct, assault punishable as a Class A misdemeanor, burglary of a motor vehicle, or unauthorized use of a motor vehicle.

TEX.PENAL CODE ANN. § 71.02(a)(1) (Vernon 1994).

The penal code provides the following definitions:

(a) "Combination" means three or more persons who collaborate in carrying on criminal activities, although:

(1) participants may not know each other's identity;

(2) membership in the combination may change from time to time; and

(3) participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations.

(b) "Conspires to commit" means that a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement. An agreement constituting conspiring to commit may be inferred from the acts of the parties.

TEX.PENAL CODE ANN. § 71.01 (Vernon 1994).

Other challenges to the constitutionality of section 71.02 have been defeated consistently. Section 71.02 "does not purport to punish participation in a combination or combinations generally," but instead it "punishes only combinations for the purpose of conspiring to commit, or to commit, certain specified and limited criminal objectives." *Young v. State*, 776 S.W.2d 673, 680 (Tex.App.—Amarillo 1989, no pet.). Additionally, we agree with the reasoning of the First Court of Appeals, when it opined:

The scienter element of [section 71.02] requires that a person intend to establish, maintain, or participate in a group which collaborates in carrying on a criminal activity. The meaning of the words "establish", "maintain" and "participate", of necessity require knowledge of the thing to be established, maintained, or participated in. The scienter element of the statute requires that the actor know of the criminal activity of the group. Therefore, since the statute reaches only those persons who engage in criminal acts with the requisite intent, the statute does not prohibit constitutionally protected conduct and is not unconstitutionally vague.

*Lucario v. State*, 677 S.W.2d 693, 698–99 (Tex.App.—Houston [1st Dist.] 1984, no pet.). "Clearly [section 71.02] is limited to unlawful activities." *Moore v. State*, 672 S.W.2d 242, 244 (Tex.App.—Houston [14th Dist.] 1983, no pet.). Our reading of sections 71.01 and 71.02 leads us to the understanding that the prohibited *combination* is one that is necessarily comprised of persons engaged in *criminal activity*. Our understanding of the section 71.01(b) definition of conspiracy necessarily requires the parties to agree to engage in conduct that constitutes certain criminal offenses.

Brosky argues that the "combination" at issue was that of the "world-wide skinhead movement" and that all of the examples of skinhead speech and activity detailed for the jury were merely protected political speech. He complains that "most of the State's evidence concerned 'philosophies, backgrounds ... beliefs' and 'criminal activity' of persons and organizations whose links to [Brosky] were remote or non-existent." Such an interpretation of the evidence and the statute is incorrect.

Brosky was charged with participation in a combination that included Hendry and Roberts during the early morning hours of June 7, 1991 when Roberts suggested that the three engage in a drive-by shooting; the combination did not include Brosky's general adherence to the skinhead philosophy or membership in a particular skinhead group. Murder is one of the offenses listed in section 71.02 that members of a combination, such as that of Brosky, Hendry and Roberts, may be prosecuted for. Brosky was not prosecuted for having criticized friends for "fraternizing" with non-whites, for having participated in a cross-burning, for having bemoaned the fact that the skinhead movement was on the decline, or for any activities other than those pertaining directly to the drive-by shooting, such as having helped push Hendry's car out of the driveway, having yelled "Shoot!" at the time that Roberts opened fire, or having handed Roberts the shotgun while Hendry pursued Sloan. The inclusion of testimony and evidence surrounding Brosky's adherence to the skinhead philosophy served to establish his *participation* in the combination during the events leading to and including the drive-by shooting. This testimony and evidence was not introduced to establish Brosky's mere innocent presence in Hendry's car at the time of the shooting. Sections 71.01 and 71.02 are not unconstitutionally vague to deny Brosky the opportunity to engage in skinhead rhetoric or activities in general or to deny him notice of what actions are prohibited. Points of error six, seven, and eight are overruled.

## POINTS OF ERROR NINE THROUGH TWELVE

Brosky next complains that the trial court erred by admitting into evidence a number of State's exhibits the probative value of which he claims was substantially outweighed by the danger of unfair prejudice. Specifically, Brosky asserts that the trial court should not have admitted into evidence various "hate leaflets" (points of error nine and ten), a cassette tape and printed lyrics of skinhead music (point of error eleven), and Ku Klux Klan photographs (point of error twelve).

During the examination of State's witness Chris Parrott, the trial court admitted into evidence the following:

**State's Exhibit 85,** an enlarged photo of Roberts's bedroom wall decorated with hate leaflets;

**State's Exhibit 89,** a poster titled "Hail Victory!" with a picture of Adolf Hitler proclaiming, "my spirit will rise from the grave and the world will know that I was right";

**State's Exhibit 91,** a leaflet titled, "Death of the White Race," with a picture of a racially mixed couple over the caption, "the ultimate abomination" and that was attributed to the Aryan Nation and the Knights of the Ku Klux Klan;

**State's Exhibit 93,** a photo of a Hitler Youth Flag on Roberts's apartment bedroom wall;

**State's Exhibit 94,** a leaflet titled, "No Remorse" with a picture of Hitler superimposed over a swastika above the slogan, "One day the world will know ... Hitler was right!"; and

**State's Exhibit 95,** a leaflet titled "Time for Action—White Man Wake Up" with the saying, "As long as the enemy occupies our land, hate is our law, and revenge our first duty!"

Parrott testified that in 1991 he was a skinhead and briefly shared an apartment with Roberts. Parrott said that he and Brosky were friends, that Brosky frequently visited the Parrott–Roberts apartment, and that he and Brosky were members of two skinhead groups called the Confederate White Vikings and the Strike Force. Parrott said that Brosky lived in a Dallas, Texas apartment near the intersection of Forest Lane

and Audelia Road where the Strike Force kept a post office box to receive letters from other skinhead groups around the country.

Parrott claimed that State's Exhibit 89, the "Hail Victory" poster of Hitler, was kept in a folder or notebook that Brosky was reading during a tattoo session at the Parrott–Roberts apartment. Brosky complains that the poster was attributed to the Confederate Hammerskins, a skinhead group that Brosky was not a member of. State's Exhibit 91, the "Death of the White Race" flier, was also kept in a notebook viewed by Brosky during the tattoo session, and Brosky asserts that it was improperly admitted into evidence because it was attributed to the Aryan Nation and the Ku Klux Klan, two groups that he did not belong to. State's Exhibits 94 and 95 were also in the folder that Parrott saw Brosky leafing through and were also produced by groups not directly connected with Brosky. Finally, he objects to State's Exhibit 93, the Hitler Youth flag, because it belonged to Roberts and was used to decorate the wall of the apartment shared with Parrott.

■ In point of error ten, Brosky challenges the admission of the following exhibits during examination of Sean Morris, who had lived in an apartment where the Confederate White Vikings, along with Brosky, had once held a meeting:

State's Exhibit 102, a leaflet titled "New Glory," a Philadelphia, Pennsylvania group that Brosky did not belong to;

State's Exhibit 103, a leaflet titled "Final War," with a picture of a skinhead making a "Heil Hitler" salute and containing a picture of a skinhead stomping on an African–American and attributed to the American Nazi Party;

State's Exhibit 106, a leaflet called "Death of the White Race," a poster-sized version of Exhibit 91;

State's Exhibit 107, a poster including a cartoon of an African–American being shot by a skinhead with the caption, "Smoke this, jigaboo." The same poster, produced by the Oklahoma White Man's Association, a group that Brosky had not been linked to, also had a cartoon of a skinhead skinning an African–American alive;

State's Exhibit 110, a poster depicting goose-stepping Nazi stormtroopers and connected to the Oklahoma White Man's Association;

State's Exhibit 118, a leaflet titled, "Special rights for black savages?" with a picture of a nude white woman cowering near a gun-toting African–American and attributed to the Confederate Hammerskins;

State's Exhibit 119, a leaflet attributed to the Confederate Hammerskins reading, "We are the future! The future can be yours if you have the guts to fight for it!"

The Confederate White Viking meeting that Morris testified about took place eighteen months before the murder of Donald Thomas. Morris testified that he saw Brosky at the meeting but did not see him in possession of any of the exhibits. Officer Stephen Spradling of the Dallas Police Department Gang Unit, who was involved in the raid at the apartment where the meeting occurred, claimed that the items were scattered around the floor in a haphazard fashion.

Brosky complains that no evidence connected him with the Philadelphia skinhead group, the American Nazi Party, the Aryan Nation, the Ku Klux Klan, the Oklahoma White Man's Association, or the Confederate Hammerskins and that the probative value of these exhibits was outweighed by their prejudicial potential. He asked the trial court to make a finding of fact on each exhibit to balance their probative value and prejudicial effect and asserts that it was an abuse of discretion for the trial court not to exclude these exhibits.

The State responds that Brosky's objections to the exhibits complained of in point of error nine were waived because he failed to make any objection in front of the jury when substantially similar evidence was offered by the State. According to the State, Parrott, without objection, testified extensively concerning the white supremacist movement and Brosky's involvement in it. The State maintains that because Brosky made no objection or no "running" objection to Parrott's testimony, any complaint was waived under

*Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim.App.1991).

Parrott testified that he was closer friends with Brosky than with Roberts, Parrott's roommate, and that Parrott saw Brosky on a weekly basis. Parrott said that he and Brosky were members of the Confederate White Vikings and the Strike Force, two groups whose principal objective was to promote white supremacy. According to Parrott, Brosky used a post office box located near Brosky's home that these skinhead groups maintained to receive letters and fliers from other skinhead organizations across the country. Parrott stated that the hate literature mailed to the post office box was directed at "anyone that wasn't white," and defined that group as including African–Americans, Jews, Asians, Indians, homosexuals, communists, the U.S. government, and politicians. He further testified that the Confederate White Vikings and the Strike Force were opposed to race-mixing and distributed fliers to that effect.

Parrott said that Brosky was not only present at a cross-burning in Gainesville, Texas, but that Brosky in fact lit the cross. Parrott testified that the ceremony was held to honor Robert J. Mathews, former leader of The Order, who had killed an FBI agent. Parrott further testified, without objection, that the Confederate White Vikings and the Strike Force referred to the federal government as the "Jewish-run" "Zionist Occupational Government" or "ZOG." Parrott also said that Brosky subscribed to the belief that the government was run by Jews and African–Americans and was out to destroy the white race. Brosky, Parrott continued, believed that Hitler was right in his philosophy and that one day the world would know that.

Parrott testified that the Confederate Hammerskins, a group that Brosky did not belong to, was under pressure from the federal government seeking to prosecute its members and that other skinhead splinter groups, such as the Confederate White Vikings and the Strike Force, were formed to avoid federal prosecution. When Parrott identified a "white pride" flier preaching that "hate is our law and revenge our first duty," he testified that the belief was shared by Brosky. He also said that the White Aryan Resistance mailed white supremacy literature directed against Jews and African–Americans to the post office box used by the Confederate White Vikings and the Strike Force. Finally, Parrott said that some skinheads belonged to more than one group and that while the groups and their names changed from time to time, their philosophy did not.

Brosky did not object to the testimony from Parrott that Brosky had access to the post office box used by skinhead groups to receive mail from other groups around the country, nor did Brosky object to testimony that the skinhead groups that he did belong to shared the same views as the groups that he did not belong to, notably: a conviction that Jews and African–Americans were using the federal government to oppress and destroy whites; a hatred of race-mixing; a contempt for anyone described as "non-white," including Jews and African–Americans; and a belief that Hitler was correct in his views and goals. We therefore agree with the State's assertion that evidence that was substantially similar to the exhibits complained of in point of error nine was admitted without objection during Parrott's testimony, and thus Brosky did not preserve his complaint to these exhibits.

For the exhibits complained of in point of error ten, Brosky states that the skinhead groups that he belonged to produced leaflets that contain no racial or ethnic slurs but advocate racial separatism, rather than violence. He maintains that the exhibits enumerated in point of error ten contain scurrilous racial epithets and that these exhibits had little or no connection to Brosky. He claims that they therefore had little probative value but obviously posed a distinct danger of unfair prejudice.

The State responds that Brosky failed to make timely and specific objections to Exhibits 107, 110, 118, and 119 and therefore failed to preserve any error for appellate review. Alternatively, the State claims that the evidence was properly admitted under rule 403 of the Texas Rules of Criminal Evidence because the probative value of the exhibits outweighed their prejudicial nature.

The statement of facts shows that when the State introduced Exhibits 107, 110, 118 and 119, Brosky stated "same objection as previously." We cannot say that such an objection identified what was objected to and the specific grounds for the ruling desired. *See Sandow v. State,* 787 S.W.2d 588, 595 (Tex.App.—Austin 1990, pet. ref'd); *Zillender v. State,* 557 S.W.2d 515, 517 (Tex.Crim. App.1977) (op. on reh'g). But even if Brosky's complaint had given the trial court adequate notice of the nature of his complaint to Exhibits 107, 110, 118, and 119, *see Montgomery v. State,* 810 S.W.2d 372, 387 (Tex.Crim.App.1990) (op. on reh'g), we find that it was not error for the trial court to admit any of the exhibits listed in points of error nine and ten.

■ Relevant evidence is defined as evidence that has any tendency to make the existence of any fact of consequence necessary to the determination of the action more probable or less probable than it would be without that evidence. Tex.R.Crim.Evid. 401. "[E]vidence need not by itself prove or disprove a particular fact to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence." *Montgomery,* 810 S.W.2d at 376. If a trial judge concludes that a reasonable juror would conclude that the evidence alters the probabilities involved to any degree, relevancy is present. *Id.* Rule 403 allows the trial court to exclude evidence whose probative value is substantially outweighed by its prejudicial effect, but the approach under that rule is to admit all relevant evidence unless its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* at 377. Given that virtually all evidence proffered by a party to a lawsuit will be prejudicial to the opposing party, only "unfair prejudice" provides the basis for exclusion of relevant evidence. *Id.* at 378. A trial court is given the discretion to admit or exclude evidence, and this court will not set aside the trial court's rulings absent a showing of an abuse of discretion.

*Id.* at 379. In short, judicial rulings will be affirmed if the trial court follows the appropriate analysis, even if we disagree with the weight given to individual factors. "A trial court judge is given a 'limited right to be wrong,' so long as the result is not reached in an arbitrary or capricious manner." *Id.* at 380.

■ In making a determination under rule 403, we take into account several factors: (1) how compelling the evidence serves to make more or less probable a fact of consequence; (2) the potential of the genre of evidence to impress the jury in some irrational but nevertheless indelible way; (3) how much trial time is consumed; and (4) how great the proponent's need is for this evidence. *Id.* at 389–90; *Hernandez v. State,* 891 S.W.2d 744, 748 (Tex.App.—Fort Worth 1994, pet ref'd).

■ Brosky argues that the probative nature of these exhibits was substantially outweighed by their prejudicial nature, but he does not argue that the exhibits were irrelevant. Therefore, we must presume these exhibits provided at least a small nudge toward proving or disproving some fact of consequence, namely, whether Brosky, with intent to establish, maintain, or participate in a combination, conspired to murder Donald Thomas. We next must determine whether the trial court properly conducted its rule 403 balancing test.

The State claims that the nature of the "combination"[5] was not some type of general white supremacist enterprise but rather a group of "core members." The State maintains that without evidence establishing the combination's core beliefs that advocated violence against minorities, Jews, and homosexuals, the jury would have been left with the impression that this was simply a venture by three young white men out to do a drive-by shooting. We agree with the State's argument that the evidence of hate propaganda constituted compelling evidence that the combination members of Brosky, Hendry,

5. A "combination" is defined as three or more persons who collaborate in carrying on criminal activities although: (1) participants may not know each other's identity; (2) membership in the combination may change from time to time; and (3) participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations. Tex.Penal Code Ann. § 71.01(a) (Vernon 1994).

and Roberts were motivated by their core beliefs, shared by a host of hate groups that they did not necessarily belong to, and that the combination conspired to kill a minority individual. Points of error nine and ten are overruled.

In his eleventh point of error, Brosky next complains the trial court erred in admitting State's Exhibits 92 and 98, a cassette tape and printed lyrics, because the danger of unfair prejudice substantially outweighed their probative value. State's Exhibit 98 was a cassette tape titled "N----- at the End of a Rope," by the Midtown Boot Boys, a band popular among skinheads, and State's Exhibit 92 was a poster-sized transcript of the lyrics to the same song. The tape did not belong to Brosky, Hendry, or Roberts, and although Hendry admitted there was a possibility that he listened to the tape during the hours before the shooting, he also testified that he could not "remember sitting there and actually listening to that song that night." Brosky objected that the tape had not been connected to him and that any probative value is far outweighed by its prejudicial effect.

We need not reiterate our analysis of rules 401 and 403 of the Texas Rules of Criminal Evidence, but we do repeat that *Hernandez* requires us to presume that the tape and lyrics are more probative than prejudicial. *Hernandez*, 891 S.W.2d at 748. We again find convincing the State's argument that these exhibits were introduced to demonstrate the nature of the combination and the motive for the conspiracy. *See Bush v. State*, 628 S.W.2d 441, 444 (Tex.Crim.App. 1982). Point of error eleven is overruled.

In point of error twelve, Brosky complains that the trial court erred by admitting into evidence State's Exhibits 112 and 114, Ku Klux Klan photographs, because, he maintains, they were not connected to him. Brosky states that the photographs were taken at a Klan rally in Hico, Texas and were introduced by Hendry, who had attended the rally. Hendry testified that he had not seen Brosky at the rally and did not think that Brosky "was under one of [the] sheets." Brosky argues that although other evidence established that he had participated in another cross-burning ceremony, that cross-burning had not been characterized as a Klan event.

During direct examination, Hendry testified that he left town during the summer of 1990 to attend a Klan rally in Hico, Texas and that he was present during the events depicted in Exhibits 112 and 114. Brosky did not object to that testimony. In short, Brosky complained not about Hendry's discussion of the Klan rally, but about the photographs of it. The photographs showed a rally at which Klansmen were making speeches and burning a cross. Although Brosky made timely objections to the exhibits, he made no objection when substantially similar evidence was introduced elsewhere. Accordingly, the error, if any, was cured by the admission of similar evidence without objection. *See Thompson v. State*, 691 S.W.2d 627, 635 (Tex.Crim.App.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985). Point of error twelve is overruled.

## POINTS OF ERROR THIRTEEN AND FOURTEEN

Brosky next complains that the trial court erred in overruling his challenges for cause to two venirepersons: (1) Marvin Booker, who revealed that he had been exposed to media coverage of the killing, believed that "[Brosky] was part of the skinheads and murdered a black guy," and said that he "kind of fe[lt] like [Brosky] is an enemy of mine"; and (2) Lawrence Loston, who wrote on his jury questionnaire that he "certainly ha[d] the opinion that [Brosky] was guilty ... from everything [he] ha[d] heard."

During voir dire, Booker assured the prosecutor that he would presume that Brosky was innocent and require the State to prove its case, although he later reiterated that he felt as though Brosky was his enemy. The trial court overruled Brosky's challenge of Booker for cause.

Loston admitted that he felt like Brosky was "at least a little bit guilty" and was then asked by the trial court whether media accounts had influenced him to the extent that he would find Brosky guilty. Loston con-

cluded, "I'm not sure, sir, but I don't think so." Brosky's challenge of Loston for cause was denied.

At the end of voir dire, Brosky reurged his challenges for cause and requested two additional peremptory challenges for Booker and Loston. The court denied both challenges for cause and Brosky's request for two additional peremptory challenges. Ultimately, Booker served on the jury, although the record fails to indicate whether Loston did.

The State maintains that Brosky has failed to ensure that a sufficient record was presented to this court to show error requiring reversal under *Long v. State,* 823 S.W.2d 259, 264 (Tex.Crim.App.1991), *cert. denied,* 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). The State complains that the record omits the strike list and fails to indicate the specific venire persons who comprised the jury. It argues that it is impossible to determine whether Brosky was in a logical position to strike Booker or Loston.

■ To warrant a reversal for the trial court's erroneous denial of a challenge for cause, the following must be shown:

1. the voir dire of the individual venireperson was recorded and transcribed;

2. the defendant asserted a clear and specific challenge for cause clearly articulating the grounds therefor;

3. after the challenge for cause is denied by the trial court, the defendant uses a peremptory challenge *on that venireman;*

4. all peremptory challenges are exhausted;

5. when all peremptory challenges have been exhausted, the defendant makes a request for additional peremptory challenges; and

6. finally, the defendant must assert that an objectionable juror sat on the case; i.e., the defendant must point out to the trial court that he is being forced to try the

case with a juror seated whom he would have exercised a peremptory challenge had he had one.

*Id.* (emphasis added).

■ A review of the statement of facts shows that Brosky made known his desire that the trial court grant his challenges for cause, but he failed to comply with the *Long* factors to preserve this issue for appeal. The voir dire of venirepersons Booker and Loston was recorded and transcribed, and Brosky asserted clear and specific challenges for cause to both venirepersons. At the conclusion of voir dire, Brosky reurged that the trial court grant his challenges for cause, and the court again denied his request. But he failed to exercise a peremptory challenge to Booker,[6] and he cannot show us that he exercised a peremptory challenge to Loston.[7] Although Brosky requested additional peremptory challenges after the trial court denied his challenges for cause to Booker and Loston, he failed to make clear that he had exhausted his peremptory strikes before making that request to the court. In fact, Brosky made his request for additional peremptory challenges *before* any peremptory strikes had been used. Brosky concludes in his brief that an objectionable juror—Booker—was seated on the jury, but he did not make clear in the record that he was forced to try the case with an objectionable juror whom he would have peremptorily struck had he had an additional strike. Thus, Brosky has waived his complaints of the trial court's denial of his challenges for cause. Points of error thirteen and fourteen are overruled.

### POINT OF ERROR FIFTEEN

In his fifteenth point of error, Brosky complains that the State failed to corroborate the accomplice witness testimony. *See* TEX.CODE CRIM.PROC.ANN. art. 38.14 (Vernon 1979).

---

6. Both sides agree that Booker was seated on the jury; therefore, although we have no record of the peremptory strikes exercised, it is certain that one of those strikes was not used on Booker.

7. The record is silent on whether Brosky exercised a peremptory challenge to Loston or whether Loston was seated on the jury. No jury

list was included in the transcript, nor was one requested as part of the transcript on appeal. Additionally, the statement of facts reveals that although the trial judge instructed his clerk to read the names of the jurors who had been selected, their names were omitted from the statement of facts.

Although the jury was instructed that accomplice witnesses could not corroborate each other, Brosky claims that Hendry and Roberts tried to frame Brosky by testifying that he was the one who shot and killed Thomas.

Brosky maintains that the nonaccomplice testimony established the involvement of Roberts and Hendry and a "third person" in the Mustang at the time of the drive-by shooting. Sloan and witness Claudia Riddle testified that the third person, seated in the back seat of the car, was wearing a bright white baseball cap. Brosky's fingerprints were found inside the car, establishing that Brosky had been in Hendry's car, but the fingerprint expert could not establish the age of the fingerprints. Brosky concludes that even if nonaccomplice evidence established his presence in the car, his mere presence at the scene of the crime is insufficient to corroborate the accomplice witnesses, citing *Golden v. State,* 851 S.W.2d 291, 294 (Tex. Crim.App.1993).[8]

The State responds that Brosky erroneously frames this point of error as if this court should determine whether the accomplice witness testimony is sufficiently corroborated on the offense of murder, rather than the offense of engaging in organized criminal activity, which Brosky was convicted of.[9] The State argues that the gist of that offense is that Brosky, with intent to establish, maintain, or participate in a combination, conspired to murder Thomas and that the test is whether the *agreement* was corroborated.

The State asserts that evidence showed that Brosky was an active, hardcore member of the Confederate White Vikings and the Strike Force, two skinhead groups whose philosophy espoused violence against minorities. Evidence also showed Roberts was a

member of the Strike Force. The State maintains that Parrott's testimony about Brosky visiting Parrott and Roberts at the apartment that the latter two shared is sufficient to place him in the presence of Roberts, the accomplice witness, and that testimony about Brosky's skinhead beliefs is enough to corroborate the nature of the "combination" and "conspiracy." Parrott also testified that he and Roberts had, for a time, shared an apartment decorated with Nazi and white supremacist paraphernalia and had discussed the skinhead movement with Brosky. The State asserts that eyewitness testimony corroborated Roberts's and Hendry's accounts of the conspiratorial conduct because Sloan and Riddle both testified that the party in the back seat of the Mustang was wearing a white baseball cap and Brosky was wearing such a cap when he was arrested twelve hours after the offense. The State finally points out that Brosky's fingerprints were found inside the right passenger window of the Mustang. The State concludes that the nonaccomplice evidence placing Brosky with the accomplices and at the scene of the murder, when coupled with the nonaccomplice evidence of the skinhead beliefs and activities of Brosky, Roberts, and Hendry, is sufficient corroboration of the accomplice witness testimony to connect Brosky to the conspiracy to murder Thomas.

Accomplice witness testimony is suspect and cannot alone be the basis for conviction. *Walker v. State,* 615 S.W.2d 728 (Tex.Crim.App. [Panel Op.] 1981). To determine whether an accomplice's testimony is corroborated, we must eliminate all accomplice evidence from the record and determine whether inculpatory facts and circumstances in evidence tend to connect Brosky to the

---

8. *Golden v. State,* 851 S.W.2d 291, 294 (Tex. Crim.App.1993), a conspiracy to possess cocaine case, only addresses the requirement of a "mere presence" instruction with the accomplice witness instruction. It did not address the sufficiency of the evidence corroborating the accomplice witness evidence.

9. Brosky was charged with engaging in organized criminal activity:
   (a) A person commits an offense if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination,

he commits or conspires to commit [murder]. . . .

Tex.Penal Code Ann. § 71.02(a) (Vernon 1994). "Conspires to commit" means:
   a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement. An agreement constituting conspiring to commit may be inferred from the acts of the parties.

*Id.* § 71.01(b).

offense. *Munoz v. State*, 853 S.W.2d 558, 559 (Tex.Crim.App.1993). Corroborative evidence need not establish his guilt or directly link him to the offense; it is sufficient if it "tends to connect" him to the offense. *Id.* Furthermore, all of the facts and circumstances may be looked to for corroboration, and the corroborative evidence may be circumstantial or direct. *Brown v. State*, 672 S.W.2d 487, 488 (Tex.Crim.App.1984). The accomplice testimony need not be corroborated on every element of the offense. *Warren v. State*, 514 S.W.2d 458, 463 (Tex.Crim.App. 1974), *overruled on other grounds, Reed v. State*, 744 S.W.2d 112 (Tex.Crim.App.1988).[10]

■ The mere presence of an accused in the presence of an accomplice at the scene of the crime or shortly before or after commission of an offense is not in itself sufficient corroboration. *Golden*, 851 S.W.2d at 294. But the presence of the accused with the accomplice witness may, *when coupled with the other circumstances*, be sufficient to corroborate the testimony of the accomplice witness. *Brown*, 672 S.W.2d at 489; *Mitchell v. State*, 650 S.W.2d 801, 807 (Tex.Crim.App. 1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984); *Dillard v. State*, 550 S.W.2d 45, 51 (Tex.Crim.App.1977); *Nelson v. State*, 542 S.W.2d 175, 177 (Tex.Crim. App.1976); *Cherb v. State*, 472 S.W.2d 273, 280 (Tex.Crim.App.1971).

The precise quantum of evidence necessary to satisfy the requirement of independent corroboration has been described in a variety of ways. *Ayers v. State*, 879 S.W.2d 176, 178 (Tex.App.—Houston [14th Dist.] 1994, no pet.). Evidence merely pointing the "finger of suspicion" at an accused will not suffice as independent corroboration. *Castaneda v. State*, 682 S.W.2d 535, 538 (Tex. Crim.App.1984). But seemingly insignificant circumstances may provide corroboration. *Mitchell*, 650 S.W.2d at 807; *Holmes v. State*, 70 Tex.Crim. 423, 157 S.W. 487, 493 (1913). For example, in *Reed*, 744 S.W.2d at 124, independent testimony showed that the defendant's wife was murdered by someone, and other nonaccomplice testimony showed

that the defendant was having an affair with a co-worker and that he had told a different co-worker that he planned to get rid of his wife after the birth of their child and would "knock her in the head" if he "thought he could get away with it."

Recently, the court of criminal appeals stated:

All that is required is that there be *some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense alleged in the indictment. *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim.App.1991) [*cert. denied,* —— U.S. ——, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993) ]. Judicial experience shows that no precise rule can be formulated as to the amount of evidence that is required to corroborate the testimony of an accomplice witness. *Paulus v. State*, 633 S.W.2d [827] at 844 [ (Tex.Crim.App.1982) ].

*Gill v. State*, 873 S.W.2d 45, 48 (Tex.Crim. App.1994).

■ The corroborating evidence need not be of such substance to be sufficient evidence on its own to convict the accused. *Eickenhorst v. State*, 662 S.W.2d 622, 625 (Tex. App.—Houston [14th Dist.] 1983, pet ref'd). We must look to all the factors and circumstances of the case to determine whether there is nonaccomplice evidence that tends to connect Brosky to the offense. *Mitchell*, 650 S.W.2d at 807. Each case must be considered on its own facts and circumstances. *Munoz*, 853 S.W.2d at 559. If the nonaccomplice evidence does not connect Brosky to the offense, the evidence to support the conviction is insufficient, resulting in an acquittal. *Id.* at 560. To determine the sufficiency of corroboration, we must view the corroborating evidence in the light most favorable to the jury's verdict. *Gill*, 873 S.W.2d at 48.

■ Viewed in the light most favorable to the jury's verdict, the corroborating evidence shows the following: (1) Steve Sloan, a witness to the shooting who pursued Hendry's Mustang and obtained its license plate number for police, saw a person in the back seat

---

10. *Warren* was overruled by *Reed* to the extent that *Warren* required corroboration to make the accomplice testimony "more likely than not."

*Reed* did not overturn that portion of *Warren* holding that the accomplice need not be corroborated on every element of the offense.

of the car wearing a white baseball cap; (2) Claudia Riddle, who also witnessed the shooting, noticed that the back seat passenger in the Mustang was wearing a white baseball cap; (3) Brosky was wearing a white baseball cap when he was arrested at Roberts's apartment complex pool the evening after the slaying; (4) Brosky was arrested at the same location where police found Roberts's shotgun, which was used in the killing; [11] (5) Brosky's fingerprints were found on the inside passenger window of Hendry's Mustang; (6) Officer Dennis Parker of the Arlington Police Department was told by Hendry's mother that on June 6 and 7 her son had been with "Trey" and "another kid, name of Chris"; (7) when Parker told Roberts that he was looking for a young man named "Chris," Roberts told police that Brosky was outside by the swimming pool; and (8) Brosky was an active, hardcore member of the Confederate White Vikings and the Strike Force, two skinhead groups whose philosophy espoused violence against minorities. Evidence also showed Roberts was a member of the Strike Force.

Although it is possible that Brosky's fingerprint was left in the car before the evening of June 6–7 and that some other person was wearing the white baseball cap while seated in the back of the Mustang at the time of the shooting, both factors still tend to connect Brosky to the offense. Additionally, Brosky was arrested at the location where the shotgun was found. Most significantly, when police were given a lead by Hendry's mother that her son had been with "another kid, name of Chris," the previous evening, Roberts immediately directed police to Brosky. Although Officer Parker's testimony regarding the lead from Hendry's mother is hearsay, Brosky failed to object. Hearsay admitted without objection has probative value. *See* Tex.R.Crim.Evid. 802. Finally, there was the weighty nonaccomplice evidence on Brosky's involvement with Roberts in the racist skinhead movement. We find that the accomplice witness testimony was sufficiently corroborated; it tended to connect Brosky to the offense of organized crim-

inal activity. *See Brown,* 672 S.W.2d at 488–89 (evidence that defendant was at scene, coupled with suspicious circumstances where defendant was in company of accomplice witness shortly before crime, was sufficient corroboration). Point of error fifteen is overruled.

## POINTS OF ERROR SIXTEEN
## AND SEVENTEEN

■ Brosky, in point of error sixteen, complains that because he had already been convicted of the same offense, his second conviction violates the double jeopardy clause of the Fifth Amendment to the United States Constitution. He seemingly argues that conspiracy is a lesser included offense of murder and that because he had previously been convicted of murder, prosecution for the instant offense constituted double jeopardy.

Brosky was convicted of murder on March 23, 1993. *See Ex parte Brosky,* 863 S.W.2d 783 (Tex.App.—Fort Worth 1993, no pet.). One week later, he was indicted on charges of criminal conspiracy and engaging in organized criminal activity. *Id.* Brosky filed an application for writ of habeas corpus in the 371st District Court, complaining that prosecution for conspiracy would violate the double jeopardy clauses of the state and federal constitutions. *Id.* at 784. The trial court refused to grant the relief sought in the writ of habeas corpus, and this court affirmed that ruling. *Id.* at 788.

Brosky maintains that his double jeopardy complaint is not barred by *Ex parte Brosky* under the "law of the case" doctrine because "compelling reasons do exist for redetermination of [his] double jeopardy claim." *See Ex parte Granger,* 850 S.W.2d 513, 516 (Tex. Crim.App.1993). In *Granger,* the "law of the case" doctrine was held inapplicable, and the appellant there was able to relitigate his double jeopardy claim. Brosky relies on *Granger* and claims that the "compelling reasons" here for redetermination include the facts that this court did not have the records in both convictions before his second prose-

---

**11.** The police department's firearms expert testified that lead shot removed from the body of Donald Thomas and spent shells at the crime scene were consistent with shells fired from Roberts' shotgun.

cution and that examination of the records from both prosecutions shows the State relied on the identical acts to convict him.

In point of error seventeen, Brosky maintains that because both prosecutions required proof that Brosky and another acted in concert, they are both deemed to be conspiracy offenses for double jeopardy purposes, and his second prosecution thus violated the double jeopardy clause.

The State concedes that the "law of the case" doctrine [12] is inapplicable here but maintains that is only because Brosky intentionally failed to file a petition for discretionary review in the court of criminal appeals. The State contends that even if "the law of the case" doctrine is inapplicable, the doctrine of stare decisis should control if the applicable case law makes sense or follows logical reasoning.

This court has already evaluated and rejected each claim that Brosky now asserts on the issue of double jeopardy. We have already determined that engaging in organized crime and conspiracy is not a species of the lesser included offense of murder by complicity. We applied the *Blockburger* [13] test and concluded that "both criminal conspiracy and engaging in organized criminal activity require proof of a fact—an agreement to commit an offense—that murder as a party did not." *Ex parte Brosky*, 863 S.W.2d at 784. Next, in the murder prosecution, the jury was not instructed on the conspiratorial theory of parties, nor did the prosecutor argue that Brosky acted as part of a conspiracy. *Id.* at 785. This court also rejected Brosky's arguments based on *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954) and *United States v. Dixon*, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) and held that the controlling precedent was *United States v. Felix*, 503 U.S. 378, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992), where the United States Supreme Court recognized that a prosecution for conspiracy is not pre-

cluded by a prior prosecution for the substantive offense. *Felix*, 503 U.S. at 390–91, 112 S.Ct. at 1385, 118 L.Ed.2d at 36. Brosky has presented nothing new to this court requiring us to deviate from our holding in *Ex parte Brosky*. Accordingly, his sixteenth and seventeenth points of error are overruled.

## POINT OF ERROR EIGHTEEN

■ Brosky complains that because a jury in the prior murder trial specially found that he had not used a deadly weapon, that issue was precluded from further litigation. Thus, he concludes in point of error eighteen, that submission of Overt Act # 8, "[Brosky] handed a shotgun ... to Roberts ... so that he could shoot Donald Thomas," violated the collateral estoppel doctrine of the double jeopardy clause of the Fifth Amendment of the United States Constitution.

He asserts that in the first prosecution, the jury was asked by special issue whether they found "beyond a reasonable doubt that he used or exhibited a deadly weapon, to wit: a firearm, during the commission of the offense." The jury answered in the negative. Brosky argues that the application paragraph nevertheless allowed the second jury to convict him if he handed the shotgun to Roberts so that Roberts could shoot Thomas.

Brosky claims that Overt Acts 8 and 9 [14] were the only "acts" alleged against Brosky that necessarily infer participation in a conspiracy to murder and that because the second jury returned a general verdict, this court cannot determine beyond a reasonable doubt that the inclusion of Overt Act # 8 made no contribution to his conviction.

The State counters that Brosky is incorrect in his assertion that Overt Acts 8 and 9 are the only "acts" alleged against Brosky that infer his participation in a conspiracy to murder. The State notes that the indictment alleges that Brosky participated in eleven overt acts; that, without objection, the indict-

**12.** Under the "law of the case" doctrine, where determinations on questions of law have already been made on a prior appeal to a court of last resort, those determinations will govern the case throughout its subsequent stages, including retrial and subsequent appeal. *See Ex parte Granger*, 850 S.W.2d 513, 516 (Tex.Crim.App.1993).

**13.** *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932).

**14.** Overt Act # 9 asserted that "[Brosky] directed William George Roberts, III to shoot."

ment alleged that Brosky, Hendry, and Roberts each performed one or more of the overt acts; and that, also without objection, the trial court instructed the jury in a similar manner. The State asserts that the jury was only required to find that Brosky performed one or more of the alleged overt acts and relies on *Benson v. State,* 661 S.W.2d 708 (Tex.Crim.App.1982) (op. on reh'g), *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984). The State maintains that Brosky's invocation of the doctrine of collateral estoppel incorrectly presupposes that the State had the burden to prove, and the jury was required to find, that Brosky performed each and every overt act alleged in the indictment.

The State further contends that for collateral estoppel purposes, the mere possibility that a fact may have been determined in a former trial is insufficient to prohibit relitigation of that same issue, relying on *United States v. Gonzalez,* 548 F.2d 1185, 1191 (5th Cir.1977). The State maintains that the fact that Brosky used a deadly weapon in furtherance of organized criminal activity conspiracy or the general conspiracy was not foreclosed by the jury's prior finding that he did not use or exhibit a deadly weapon during the commission of murder.

The State compares the instant case with the situation in *Johnson v. State,* 777 S.W.2d 421 (Tex.Crim.App.1989). The jury convicted a defendant charged with aggravated sexual assault where the indictment included the assertion that Johnson used or exhibited a deadly weapon during the same *criminal episode. Id.* The *Johnson* jury then answered "no" when asked whether the defendant used or exhibited the firearm during the *commission of the offense. Id.* The court of criminal appeals, in reviewing the defendant's assertion that the findings were inconsistent, distinguished between the "same criminal episode," which involved the kidnapping at gunpoint of the complainant, and the "commission of the offense," which included the sexual assault. *Id.* at 423.

In cause number 0449052A, Brosky's murder case, the indictment included the following language:

[Brosky] ... on or about the 7th day of June 1991, did then and there intentionally and knowingly cause the death of an individual, Donald Thomas, by shooting the said Donald Thomas with a deadly weapon, to-wit: a firearm,

Count Two: And, it is further presented in and to said court, that the said [Brosky] ... on or about the 7th day of June, 1991, did then and there intentionally with the intent to cause serious bodily injury to Donald Thomas, commit an act clearly dangerous to human life, namely, shoot the said Donald Thomas with a deadly weapon, to-wit: a firearm, which caused the death of Donald Thomas.

The application paragraph at the guilt/innocence phase of the murder trial asked the jury to determine whether Brosky:

then and there knew of the intent, if any, of the said William George Roberts, III, to commit the murder of the said Donald Thomas, and that the defendant acted with intent to promote or assist the commission of the offense by encouraging, directing, aiding or attempting to aid William George Roberts, III, to commit the offense of murder of the said Donald Thomas....

The jury found Brosky guilty of murder under those instructions but then answered "No" when asked whether Brosky "used or exhibited a deadly weapon, to wit: a firearm, ... during the commission of the offense of murder."

We agree with the State's conclusion that Brosky was convicted as a *party* to the offense of murder in the first trial and that, at that time, an affirmative finding was authorized only if the defendant himself used or exhibited a deadly weapon during the commission of the offense.[15] *See Travelstead v. State,* 693 S.W.2d 400, 402 (Tex.Crim.App. 1985). Thus, it was not necessarily deter-

---

**15.** The Code of Criminal Procedure was amended in 1991 to permit the entry of an affirmative finding upon a jury's determination that a party to the offense knew that a deadly weapon would be used or exhibited during the commission of

the offense. *See* Act of May 25 1991, 72nd Leg., R.S., ch. 541, § 1, 1991 Tex.Gen.Laws 1876, 1876–77 (current version at Tex.Code Crim.Proc. Ann. art. 42.12, § 3g(a)(2) (Vernon Supp.1996).

mined that Brosky did not hand Roberts the deadly weapon *at all*, but rather it found that Brosky did not use or exhibit a deadly weapon as a primary actor during the commission of the offense of murder.

The court of criminal appeals examined collateral estoppel in *Ladner v. State*, 780 S.W.2d 247, 254 (Tex.Crim.App.1989) and concluded that the protection provided by this principle is narrower than that of double jeopardy. In *Ladner*, the court concluded that:

> the question is not whether there is a possibility that an ultimate fact was determined adverse to the government, but whether after examining the pleadings, evidence, jury charge and other relevant material in the record of the first trial a "rational jury" *necessarily* grounded its verdict upon an issue which the defendant seeks to foreclose from relitigation. Thus, as recognized in *United States v. Gonzalez*, 548 F.2d 1185 (5th Cir.1977):
>
> > ... *Adams v. United States*, 287 F.2d 701 (5th Cir.1961), supra, restated the proposition to the effect that when a "fact is not *necessarily* determined in the former trial, the possibility that it may have been does not prevent re-examination of that issue.

*Ladner*, 780 S.W.2d at 254. We agree with the State's conclusion that the fact that a jury found that Brosky did not use a deadly weapon during commission of the murder *as a party* to that offense does not preclude a jury's finding that Brosky did use a deadly weapon in furtherance of the conspiracy. Accordingly, Brosky's eighteenth point of error is overruled.

### POINT OF ERROR NINETEEN

■ Finally, Brosky argues that the trial court erred in refusing to instruct the jury on the lesser-included offense of tampering with evidence, a violation of section 37.09 of the Texas Penal Code and that the charge failed "to submit to the jury every phase of the case made by the evidence and every legitimate deduction to be drawn therefrom." *See* TEX.CODE CRIM.PROC.ANN. arts. 37.08, 37.09 (Vernon 1981). For a defendant to be entitled to a charge on a lesser-included offense,

the offense must be included within the proof necessary to establish the offense charged and some evidence must exist in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser-included offense. *Bartholomew v. State*, 871 S.W.2d 210, 212 (Tex. Crim.App.1994); *Creel v. State*, 754 S.W.2d 205, 210 (Tex.Crim.App.1988).

■ The penal code provides that a person commits an offense if:

> knowing that an investigation or official proceeding is pending or in progress, he:
>
> > (1) alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding; ...

TEX.PENAL CODE ANN. § 37.09(a)(1) (Vernon 1994).

Brosky contends there was no direct evidence that he ever agreed to participate in the drive-by murder and points out that Hendry testified that Brosky "didn't agree to do anything.... He was just there." Brosky concludes that a rational juror could have concluded that Brosky did not agree to murder anyone but attempted to conceal evidence of the crime to thwart the pending investigation.

The State responds that Brosky was not entitled to the instruction because the requirement that a defendant "kn[ow] that an investigation ... is pending or in progress" is an element not required by the conspiracy offense charged and that section 37.09 thus is not a lesser-included offense. The trial court refused to include the charge.

Brosky claims "pending" is synonymous with "imminent," which is defined as "ready to take place," "to hover threateningly," and "to be about to occur." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY, 869 (1983). He claims that "no rational juror could have concluded that [he] 'advised Joshua Hendry to drive his automobile normally to avoid detection as they fled the scene of the shooting of Donald Thomas,' Overt Act # 11, or that he watched for 'any potential pursuit by witnesses to the offense,' Overt Act # 12, without believing that Brosky knew, 'an in-

vestigation was pending.'" He asserts that Overt Act # 14, which alleged that Brosky helped conceal the shotgun shell, infers that he knew an investigation was pending and wanted to impair the shell's availability as evidence in the investigation.

An offense is a lesser included offense if:

(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX.CODE CRIM.PROC.ANN. art. 37.09 (Vernon 1981); *Ex parte Brosky*, 863 S.W.2d at 784.

The elements required to establish a violation of section 37.09, tampering with or fabricating physical evidence, are:

(a) A person commits an offense if, knowing that an investigation or official proceeding is pending or in progress, he:

(1) alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding; or

(2) makes, presents, or uses any record, document, or thing with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding.

TEX.PENAL CODE ANN. § 37.09 (Vernon 1994).

The elements required to establish a violation of section 71.02 are:

(a) A person commits an offense if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination ... he commits or conspires to commit one or more of the following:

(1) murder, capital murder, arson, aggravated robbery, robbery, burglary, theft, aggravated kidnapping, kidnapping, aggravated assault, aggravated sexual assault, sexual assault, forgery, deadly conduct, assault punishable as a Class A misdemeanor, burglary of a motor vehicle, or unauthorized use of a motor vehicle;

TEX.PENAL CODE ANN. § 71.02(a)(1) (Vernon Supp.1996).

The penal code also provides that the commission or conspiracy to commit other criminal offenses, including gambling, promotion of prostitution, or offenses under chapters 32, 34, and 36 of the penal code, are sufficient to establish a violation of section 71.02. *See* TEX.PENAL CODE ANN. § 71.02(a)(2) through (10) (Vernon Supp.1996). The commission of evidence tampering or conspiracy to commit evidence tampering is not included as one of those miscellaneous offenses listed in subsections 71.02(a)(2) through 71.02(a)(10). Clearly, a violation of section 37.09 does not consist of an attempt to commit a violation of section 71.02(a) or an otherwise included offense. TEX.CODE CRIM.PROC.ANN. art. 37.09(4); *Ex parte Brosky*, 863 S.W.2d at 784. We cannot say that a violation of section 37.09 differs from a violation of section 71.02 "only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission." TEX.CODE CRIM.PROC. ANN. art. 37.09(2); *Ex parte Brosky*, 863 S.W.2d at 784. Further, we cannot conclude that a violation of section 37.09 differs from a violation of section 71.02(a) "only in the respect that a less culpable mental state suffices to establish its commission." TEX.CODE CRIM.PROC.ANN. art. 37.09(3); *see Ex parte Brosky*, 863 S.W.2d at 784.

Brosky has not provided, nor can we find, any authority for the proposition that the lesser offense of tampering with evidence is included within the proof necessary to establish the offense of engaging in organized criminal activity. Section 71.02 requires that an actor not only agree to participate, but must also perform some overt act in pursuance of an agreement to commit a separate criminal offense. *See Barber v. State*, 764 S.W.2d 232 (Tex.Crim.App.1988). The additional criminal offense, such as murder, need

not ever actually take place but instead must be *planned.* Conversely, it appears to this court that for a person's actions to fall within the confines of section 37.09, a separate criminal offense must *already* have been committed; otherwise, the actor could not "kn[ow] that an investigation ... is pending." TEX.PENAL CODE ANN. § 37.09 (Vernon 1994). We reject the argument that conduct that is necessarily conducted after a crime has been committed is a lesser-included offense of engaging in organized criminal activity. We do not find, then, that proof of a violation of section 37.09 is established by proof of the same or less than all the facts required to establish the commission of section 71.02. TEX.CODE CRIM.PROC.ANN. art. 37.09(1); *Ex parte Brosky,* 863 S.W.2d at 784. Because the first prong of the *Bartholomew* test is not met, we have no need for further analysis. Point of error nineteen is overruled.

The judgment of the trial court is affirmed.

DAUPHINOT, J., dissents with opinion.

DAUPHINOT, Justice, dissenting.

The majority, in its thorough and well-written opinion, hold that the nonaccomplice evidence is sufficient to corroborate the accomplice testimony in proving Brosky guilty of engaging in organized criminal activity and that prosecution was not barred by Brosky's double jeopardy claim. I respectfully dissent. The majority has misconstrued the requirements for corroboration of accomplice testimony. They have, thereby, incorrectly applied the law to the facts of this case.

Through their incorrect application, the majority finds the nonaccomplice testimony sufficient to connect Brosky to the offense, not of murder, but to the offense of engaging in organized criminal activity. Brosky was tried and convicted as a party to the murder of Donald Thomas in 1993. The jury assessed his punishment at ten years probated and found he neither used nor exhibited a deadly weapon in the commission of the offense. Brosky was subsequently indicted and tried for engaging in organized criminal activity in Thomas's murder. If proving Brosky was a party to murder is sufficient to prove the organized criminal activity, then the majority admits there is no distinction between the elements necessary to prove murder as a party and those necessary to prove engaging in organized criminal activity. Brosky is, then, correct in claiming he has already been tried for this offense. His double jeopardy claim should be sustained.[1] If proving Brosky a party to murder is not sufficient to connect him to engaging in organized criminal activity, the evidence is insufficient to support his conviction in the case before us.

Even if Brosky was in the back seat of the car at the time of the shooting, unless his membership in white supremacist groups or his participation as a party to the murder constituted the organized criminal activity, there is no evidence to connect him to 1) an intent to establish, maintain, or participate in a combination, and 2) a conspiracy to commit murder, separate and apart from his participation in the murder as a party.

The elements of engaging in organized criminal activity are that: 1) a person; 2) with intent to establish, maintain, or participate in a combination; 3) commits[2] or conspires to commit; 4) murder.[3] A "combination" means three or more persons who collaborate in carrying on criminal activities.[4] "Conspiracy to commit" means to agree with one or more persons that they or one or more of them engage in conduct that would constitute the offense and the person and one or more of them perform an overt act in pursuance of the agreement. An agreement constituting conspiring to commit may be inferred from the

---

1. This question was not squarely before this court in *Ex parte Brosky,* 863 S.W.2d 783 (Tex. App.—Fort Worth 1993, no pet.) because we could not know what evidence would be offered to prove Brosky engaged in organized criminal activity.

2. Brosky was not indicted for committing the murder, only conspiring to commit.

3. TEX.PENAL CODE ANN. § 71.02(a)(1) (Vernon Supp.1996).

4. TEX.PENAL CODE ANN. § 71.01(a) (Vernon 1994).

acts of the parties.[5]

The elements necessary to convict a person as a party to an offense are that the person: 1) acts with intent to promote or assist the commission of the offense, and 2) solicits, encourages, directs, or aids the other person to commit the offense.[6]

Section 7.02(b), in describing party liability, refers to the end product of acting with others as a "conspiracy," and to the persons participating in furtherance of the unlawful purpose as "conspirators." The penal code uses the terms parties and conspirators interchangeably.[7] In fact, neither the party nor the co-conspirator is required to be present at the time of the commission of the murder. In *Robinson v. State*,[8] the Court of Criminal Appeals stated that to be guilty as a party, if not present at the commission of the offense, the person must himself actively engage in the furtherance of the common purpose and design at some other place.

In the case before us, Brosky is charged with engaging in organized criminal activity. The commission of any single overt act, if it was committed in furtherance of the murder, is sufficient to establish the actor as a party to the murder. What, then, sets the organized criminal activity apart from prosecution of the murder? It is not the overt acts. Is it the agreement? Remember, the jury was given a charge that allowed them to infer an agreement from the acts of the *parties*. If we are to believe the Court of Criminal Appeals meant what it said in *Robinson*, the agreement to commit the murder is sufficient to make one a party to the murder. By examining how Texas courts have traditionally construed the law of parties, it becomes clear that the "agreement" does not distinguish engaging in organized criminal activity from acting as a party as our court held in

the majority opinion and in *Ex parte Brosky*.[9]

*Middleton v. State*[10] sets out the law of criminal responsibility for members of a joint criminal enterprise. Today we call it "the law of parties." Mere presence does not give rise to criminal responsibility.[11] The Court of Criminal Appeals stated that in order to prove a person a party to a criminal offense, "the evidence must show, and the charge of the trial court submit, that at the time of the commission of the offense, the parties must be acting together, *each doing some part in the execution of the common purpose*."[12]

In a long line of cases, the Court of Criminal Appeals has further clarified the law of parties. In *Mayfield v. State*,[13] the Court explained that because section 7.02 of the Penal Code requires both encouragement of and intent to promote the commission of the offense, mere presence at the scene of an offense does not make that person a party to the offense, absent an agreement. This agreement, then, that the offense should be committed, coupled with presence at the scene of the crime, establishes both encouragement of and intent to promote the commission of the offense.

The Court of Criminal Appeals further instructs us that in determining whether an individual is a party to an offense, the court may look to events before, during and after the commission of the offense.[14] Importantly, the Court states that evidence of an "agreement" to commit an offense and, thereby, act as a party may be inferred from the evidence:

'An agreement of parties to act together in a common design can seldom be proved by words, but reliance can often be had on the actions of the parties showing an un-

---

5. *Id.* § 71.01(b).

6. *See* TEX.PENAL CODE ANN. § 7.02(a)(2) (Vernon 1994).

7. *Compare* TEX.PENAL CODE ANN. § 7.02(b) with § 71.01.

8. 493 S.W.2d 780, 782 (Tex.Crim.App.1973).

9. 863 S.W.2d at 788.

10. 86 Tex.Crim. 307, 217 S.W. 1046 (1920).

11. *Id.* 217 S.W. at 1053 (op. on reh'g).

12. *Id.* (emphasis added).

13. 716 S.W.2d 509, 517 (Tex.Crim.App.1986).

14. *Wygal v. State*, 555 S.W.2d 465, 468–69 (Tex. Crim.App.1977).

derstanding and a common design to do a certain act. . . .'

*Participation in an enterprise may be inferred from the circumstances and need not be shown by direct evidence.* Circumstantial evidence may be sufficient to show that one is a party to the offense.[15] This court has followed the teaching of the Court of Criminal Appeals.[16]

The trial court in the case before us instructed the jury that "the agreement of the parties may be inferred from their actions." In the first trial and based upon the same acts by the parties, the jury was allowed to convict Brosky of murder as a party by inferring an agreement to act together in a common design. Therefore, while murder alone does not require proof of an agreement, murder as a party does require such proof.[17] In fact, the agreement is an essential element in proving murder under the law of parties. The elements of murder as a party and of engaging in organized criminal activity as alleged in the indictment before us are, then, the same, except that murder has an additional element of actually causing the death. And it is the offense of engaging in organized criminal activity that requires corroboration in the case before us, not simply the murder for which Brosky has already been convicted as a party.

The "Accomplice Witness Rule" prohibits conviction based upon the testimony of any accomplice unless that testimony is corroborated by the evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense.[18] The need for non-accomplice corroborating testimony is especially great in this case due to Hendry's and Roberts's initial attempts to frame Brosky as the shooter. The testimony

of Brosky's accomplices is inherently suspect and, without corroboration, cannot form the basis for conviction.[19]

In order to convict Brosky of engaging in organized criminal activity, the jury was charged with finding that Brosky not only agreed with his co-conspirators to engage in conduct constituting the offense, with the intent to establish, maintain, or participate in a combination, but also that he and at least one of the co-conspirators performed an overt act in furtherance of that agreement. The majority is correct when it states that in order to determine whether an accomplice's testimony is corroborated, we must eliminate all accomplice evidence from the record and determine whether inculpatory facts and circumstances in evidence tend to connect Brosky to the offense of engaging in organized criminal activity.[20]

In the case before us, all the evidence linking Brosky with the commission of engaging in organized criminal activity comes from his accomplices. Absent their testimony, even the legal gymnastics performed by the majority cannot do more with the corroborating evidence than simply place Brosky in the presence of Hendry and Roberts. The majority relies heavily on the nonaccomplice evidence of:

- Brosky's fingerprint found in the car. (Although it could not be established when the print was left, and clearly a print inside the car does not corroborate a statement that Brosky helped push the car.)
- Sloan and Riddle's testimony that someone in the car wore a white baseball cap at the time of the murder.
- Detective Rosas's testimony that Brosky was wearing a white baseball cap when arrested at the same location where police

---

15. *Id.* at 469 (emphasis added).

16. *In re A.B.,* 868 S.W.2d 938, 941 (Tex.App.— Fort Worth 1994, no writ).

17. *See, e.g., Blackstock v. State,* 115 Tex.Crim. 284, 29 S.W.2d 365 (1930); *Cone v. State,* 86 Tex.Crim. 291, 216 S.W. 190 (1919); *Machado v. State,* 494 S.W.2d 859 (Tex.Crim.App.1973); *Haddad v. State,* 860 S.W.2d 947 (Tex.App.— Dallas 1993, pet. ref'd); *Horton v. State,* 880 S.W.2d 22 (Tex.App.—Tyler 1993, pet. ref'd).

18. Tex.Code Crim.Proc.Ann. art. 38.14 (Vernon 1979).

19. *See Walker v. State,* 615 S.W.2d 728 (Tex. Crim.App. [Panel Op.] 1981).

20. *See Munoz v. State,* 853 S.W.2d 558, 559 (Tex. Crim.App.1993).

found Roberts's shotgun hidden in a closet. (Brosky was not inside the apartment until asked by Rosas to go inside. Rosas merely found him in the apartment complex generally, specifically at the pool.)

● Brosky's involvement in the skinhead movement.

● Hendry's mother's statement to the officer that her son had been with "Chris" on the night in question, and Roberts's response, when questioned by the officer about Hendry's mother's statement, to lead the officer to Brosky. (The majority does not explain how a statement elicited to show the officer's state of mind can be considered as corroborating evidence.)

This evidence does nothing more than possibly tend to establish that Brosky went along for a ride. Nowhere is there corroboration of Brosky's participation in an overt act to further the killing of Thomas or even his intent to commit the offense.

The State argues, vehemently, that Brosky's long-term participation in skinhead activities establishes the requisite agreement concerning the conspiracy to commit a racially-motivated murder. It asserts that the conspiratorial combination was established by the nonaccomplice testimony that placed Brosky and Roberts in hard-core skinhead organizations advocating violence against various racial, ethnic, and social minorities. However, the State does not provide for us, nor have we been able to find, authority for the proposition that Brosky's participation in the "combination" responsible for Thomas's murder in the early hours of June 7 may be corroborated by Brosky's membership in skinhead groups and advocacy of their views generally. Were we to find Brosky's membership in these groups sufficient to corroborate his participation in the "combination" that performed a murder at a particular time, we could be paving the way for the prosecution of political or social activists who express their views in vitriolic or hyperbolic terms but who cannot be linked to a discrete conspiracy to commit a specific offense.

And even Brosky's involvement in the skinhead movement was not proved through facts, but rather through a myriad of skinhead leaflets, posters, photographs, and song lyrics that were not even connected to Brosky. I disagree with the majority's dismissal of Brosky's points of error nine through twelve that deal with the prejudicial effect of this mass of evidence when they assert that Brosky waived his complaint by allowing some evidence of skinhead activities to come in without objection and that the evidence demonstrated the nature of the combination and the motivation for it, which was shared by a "host of hate groups that they did not necessarily belong to."

Specifically, the cassette tape entitled "Nigger at the end of a Rope" and a poster size transcription of the lyrics were introduced into evidence although the tape did not belong to Brosky, Hendry, or Roberts and none of the three could "remember sitting there and actually listening to that song that night." The State successfully argued at trial that the song "goes to show motive, intent . . . and the type of racial violence that [Brosky] advocates and a common purpose for the conspiracy." But how can the majority use that evidence to establish Brosky's role in this criminal combination? And if it does tend to establish that, then would not it also be true that listeners of rap music espousing desires to kill police officers or abuse women are part of criminal combinations to commit those acts whenever they occur?

A quick review of the State's case against Brosky reveals an almost complete lack of nonaccomplice evidence. Brosky spent the night of June 6–7, 1991 with Hendry and Roberts. The three spent much of the late evening and early morning talking around a table in Hendry's bedroom. Brosky shared Hendry's and Roberts's concerns about the declining reputation of the local skinhead movement. We know this only because Hendry and Roberts told us. Brosky implicitly agreed to participate in a drive-by shooting suggested by Roberts to restore the reputation of the skinhead movement; that was the testimony of Hendry and Roberts. The only portion of this scenario that could be corroborated by nonaccomplice testimony was Rosas's comment that Ann Hendry said her son was with "another kid" named "Chris" on the evening of June 6–7, 1991, but even if we assume that the "Chris" referred to by Ann

Hendry was in fact Brosky, his mere presence in the company of Hendry and Roberts at some point during the evening is insufficient to corroborate the offense of engaging in organized criminal activity.

Brosky was the first of the three to leave the house by climbing out of Hendry's bedroom window; Hendry and Roberts said he was. It was Roberts who reassured Hendry that Brosky could be trusted. Brosky held Roberts's shotgun as the latter climbed out through the window; we know this only because that was Roberts's testimony. Brosky helped push Hendry's car out of the driveway so that the noise of its engine would not disturb Hendry's mother. How do we know that Brosky helped push the car? Hendry and Roberts told the jury he did. We know Brosky eventually got into the car and rode in the back seat, only because Roberts said he did. We know that Brosky was wearing a white baseball cap while seated in the car, because Roberts and Hendry told us he was. Roberts and Hendry told us that the three were listening to skinhead music advocating racial hatred during their search for a victim. No one else overheard any of the lyrics of the "Boot Town Boys" or any of the other hate groups whose messages were played in the car.

We know that the three passed a police car during their drive through Arlington because Hendry told us so. It is not clear whether Hendry or Roberts first spotted Thomas, but Hendry testified that Brosky told Roberts the potential victim had been spied. Brosky handed Roberts the murder weapon, which had been in the back seat, so that Roberts could open fire. How do we know that Brosky handled the gun immediately before the shooting? Roberts told us he did. Brosky shouted "Shoot!" just before Roberts pulled the trigger; Hendry alone heard him.

It was Hendry who testified that Brosky kept a lookout for Sloan's pursuit of the Mustang, and it was Hendry who told the jury that Brosky handed Roberts the shotgun when the latter contemplated firing on Sloan. Sloan and Riddle saw only a white baseball cap on the head of a back-seat passenger. They never saw a face of the back-seat passenger, and neither heard anyone shout "Shoot" before the murder. Finally, after the three returned to Hendry's home, it was Roberts who claimed Brosky placed one of the shotgun shells in the toilet to dispose of the evidence. How did Roberts know this? Because Hendry told Roberts that is what Brosky did.

Brosky's fingerprint on the inside of Hendry's car, the statement that "Chris" had been with Hendry on the evening in question, and Roberts's identification of Brosky as the "Chris" he and Hendry had been with on June 6–7, 1991 establish Brosky's presence but fail to corroborate his intent to engage in organized criminal activity. Sloan's and Riddle's testimony that someone in the car wore a white baseball cap tends to support testimony that Brosky was in the back seat of the car at the time of the shooting; however, mere presence at the target offense is insufficient to corroborate accomplice witness testimony as to the organized criminal activity.[21]

After eliminating all accomplice evidence from the record to determine whether inculpatory facts and circumstances in evidence tend to connect Brosky to the offense in chief, that is, to the organized criminal activity, I find that the evidence does not tend to establish that he did anything more than go along for a ride at the time of the murder. This nonaccomplice evidence is insufficient to sustain his conviction for engaging in organized criminal activity:

> A chain is no stronger than its weakest link, and if the State must rely on the accomplice's testimony for some material fact without any corroboration whatsoever, the conviction cannot stand. It is unfortunate that designing criminals sometimes so lay the scene of their activities that there is great difficulty in proving their guilt, and more unfortunate still is it that frequently the State is not able to do so, but such is no argument in favor of a rule which would permit the conviction of innocent people on the testimony of a party or parties involved in the crime, or that reliance may be had on, "the finger of suspicion." For the purpose of corroborating

21. *See Etheredge v. State,* 542 S.W.2d 148, 150 (Tex.Crim.App.1976).

testimony which is considered too unreliable to take human liberty, something stronger is required than mere suspicion. This court has always so held.[22]

As a result, I believe that the State failed to corroborate Hendry's and Roberts's testimony. The law is clear that the mere presence of an accused in the company of an accomplice shortly before or after the commission of an offense is not in itself sufficient corroboration of accomplice testimony to support conviction of a defendant.[23] The majority misconstrues the requirements for corroboration of accomplice testimony, or else the majority forgets that Brosky was on trial, not for murder either as a principal or as a party, but rather for the offense of engaging in organized criminal activity. Simply spending time with people who post racially directed hate propaganda on their walls does not satisfy the requirements of corroboration of engaging in organized criminal activity.

For the above reasons I respectfully dissent.

---

**22.** *Almazan v. State,* 140 Tex.Crim. 432, 145 S.W.2d 576, 579 (1940).

**23.** *Etheredge,* 542 S.W.2d at 150.