

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-09-023-CR

JOEMAR JACKSON                                                     APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Joemar Jackson appeals his conviction for capital murder. In six issues, Jackson argues that the trial court erred by denying his *Batson* challenge, by overruling his objections to the State's closing argument, by refusing to grant a mistrial based on inadmissible hearsay, by overruling his objection to later hearsay,

---

[1] *See* Tex. R. App. P. 47.4.

and by not including an accomplice-witness instruction in the jury charge. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Eric Witt was a drug dealer in the Como area of Fort Worth. He was at his home one evening with his friend Kretearria Porter when Jackson came over, purchased some drugs from Witt, and left. Another man showed up to buy drugs after Jackson left. As the man was leaving Witt's house, two men carrying guns forced their way inside. The first man carried a black gun, and the second man carried a silver gun; both men had bandanas covering their faces below their eyes. The first man shot Witt in the hand as he was trying to shut the door on the men, and Witt fell to the ground.

One of the men ordered Porter to lay on the floor. The man with the silver gun asked Witt, "E, where's the dope at?" Witt told him it was in a cracker box in the kitchen. One of the men searched Witt's pockets as he lay on the floor. The man with the black gun stood over Witt and shot Witt in the back of the head as they were leaving. The two men left, and the man who had just purchased drugs fled out the front door after them. Witt died from the gunshot wound to his head.

Police eventually arrested James Phillips, Kenneth Francis, Nathaniel Baldwin, and Jackson in connection with Witt's murder. Francis admitted to participating in the robbery, and he told detectives that Jackson was the robber who

2

shot Witt.  Phillips also admitted to participating in the robbery and told detectives that Jackson was the shooter.

At Jackson's trial, Francis testified that Phillips, Baldwin, and Jackson had planned to rob Witt and that Francis's role was to go to Witt's house to buy drugs so that he could determine how many people were inside Witt's house.  By the time Francis got to Witt's house, Phillips and Jackson were already inside; Francis saw Witt and Porter laying on the floor, Phillips standing over Witt with a chrome gun, and Jackson in the kitchen with a black gun. Witt was pleading for them not to kill him and was saying, "It's in the box.  It's in the box."  Francis ran back to his car and heard a gunshot.  Sometime after the robbery, Francis saw Jackson and asked him why he had shot Witt.  Jackson told him, "When I shot E, [Phillips] threw up."  Francis testified that he had agreed to testify for the State in exchange for an eight-year sentence for conspiracy to commit robbery.

Phillips testified that on the day of Witt's murder, Baldwin had showed up at his house and had told him, "Let's go get this money."  Phillips did not know exactly what he was talking about, but he knew that Baldwin was asking if he wanted to go rob someone. Phillips got in the car with Baldwin, Jackson, and Francis and learned that they planned to rob Witt. Phillips testified that Baldwin's role in the robbery was "[j]ust getting the door open."  According to Phillips, Baldwin approached Witt's house first under the guise of purchasing drugs, and while Baldwin was inside, Jackson "bust[ed] up in there."  Phillips said that he and Francis were still outside

3

when they heard a gunshot. Phillips went inside and saw that Witt had been shot in the hand. Phillips started grabbing money and drugs. He was carrying a chrome-plated revolver. He testified that he ran to his mother's house after the robbery and threw up at her house from running so hard. Phillips explained that he had agreed to testify for the State in exchange for a twenty-five-year sentence for capital murder.

LaTonia Clark testified that Francis was her boyfriend when Witt was murdered. On the night of Witt's murder, Clark heard Phillips tell Francis that he wanted to rob Witt because he and Jackson had seen "a lot of money or drugs" at Witt's house. Later that night, Francis was taking a bath when he told Clark about the robbery. He was crying, and he told Clark that Jackson had shot Witt in the back of the head and that Phillips had thrown up in Witt's house.

Lee Hall testified that he lives in Como and knows Jackson, Phillips, Francis, and Baldwin. After Witt's murder, Hall overheard a conversation between Jackson and a man who lives next door to Hall's grandmother. Jackson was talking about Phillips and said, "I hope the boy can hold water. I ain't never did no crime. I ain't never did no dirt with him. I just hope he don't snitch on me." Hall explained that when Jackson said he "ain't never did no dirt with [Phillips]," Jackson meant that he had never committed a crime with Phillips. Hall also overheard Jackson tell the man, "Man, I should have murked [Phillips]," which is a street term for murder.

Donald Coleman testified that he had a sexual relationship with Phillips at the time of Witt's murder and that Phillips had told him that Phillips, Jackson, and

4

Francis robbed "the dope man." Coleman testified that Phillips had told him that Jackson shot Witt during the robbery.

Marquies Amos testified that he knows Phillips, Francis, Baldwin, and Jackson and that he had known Witt. Amos said that Phillips had told him that Jackson shot Witt during the robbery. Amos also testified that Jackson confessed to him that he had shot Witt because, during the robbery, Phillips was calling Jackson by his name in front of Witt and because Witt was telling Jackson, "I know where y'all live." Amos agreed to testify for the State in exchange for a plea agreement with his brother regarding unrelated charges.

The jury convicted Jackson of capital murder. Acknowledging that the State had waived the death penalty, the trial court sentenced Jackson to life in prison.

### III. *BATSON* CHALLENGE

In his first issue, Jackson argues that the trial court erred by overruling his *Batson* challenge regarding the State's use of a peremptory strike on veniremember 3, who was African-American. Jackson asserts that the State's proffered race-neutral reason for striking veniremember 3 was a pretext for racial discrimination. Jackson is African-American.

### A. Law on *Batson* Challenges

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits race-based jury selection. U.S. Const. amend. XIV; *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986); *Jasper v. State*,

5

61 S.W.3d 413, 421 (Tex. Crim. App. 2001); *see* Tex. Code Crim. Proc. Ann. art. 35.261(a) (Vernon 2006). In the face of perceived purposeful discrimination, the defendant may request a *Batson* hearing to address the challenge. *See* Tex. Code Crim. Proc. Ann. art. 35.261(a).

Trial courts follow a three-step process when resolving *Batson* challenges. *Snyder v. Louisiana*, 552 U.S. 472, 476, 128 S. Ct. 1203, 1207 (2008); *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App.), *cert. denied*, 130 S. Ct. 1015 (2009). First, the defense must make a prima facie case of racial discrimination. *Snyder*, 552 U.S. at 476, 128 S. Ct. at 1207; *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 92 (2008). Second, if the prima facie showing has been made, the burden of production shifts to the State to articulate a race-neutral reason for its strike. *Snyder*, 552 U.S. at 476, 128 S. Ct. at 1207; *Watkins*, 245 S.W.3d at 447. Third, if the State tenders a race-neutral explanation, the trial court must then decide whether the defendant has proved purposeful racial discrimination. *Snyder*, 552 U.S. at 476, 128 S. Ct. at 1207; *Watkins*, 245 S.W.3d at 447.

The step-two explanation need only be race neutral on its face. *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S. Ct. 1769, 1771 (1995); *Watkins*, 245 S.W.3d at 447. The ultimate plausibility of that race-neutral explanation is to be considered as part of the third step of the analysis, in which the trial court determines whether the defendant has satisfied his burden of persuasion to prove that the strike was

6

indeed the product of the State's purposeful discrimination. *Purkett*, 514 U.S. at 768, 115 S. Ct. at 1771; *Watkins*, 245 S.W.3d at 447. Throughout the challenge, the burden of persuasion remains with the defendant. *Purkett*, 514 U.S. at 768, 115 S. Ct. at 1771; *Ford v. State*, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999). The defendant must prove by a preponderance of the evidence that the allegations of purposeful discrimination were true in fact and that the prosecutor's reasons were merely a sham or pretext. *Watkins*, 245 S.W.3d at 451–52.

## B. Standard of Review

On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. *Snyder*, 552 U.S. at 477, 128 S. Ct. at 1207; *Watkins*, 245 S.W.3d at 448. Appellate courts must give great deference to credibility and demeanor determinations made by the trial court in connection with a *Batson* inquiry. *Snyder*, 552 U.S. at 477, 128 S. Ct. at 1208. The court of criminal appeals has explained our review of a *Batson* ruling as follows,

> In assaying the record for clear error, *vel non*, the reviewing court should consider the entire record of voir dire; it need not limit itself to arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record. But a reviewing court should examine a trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous.

*Watkins*, 245 S.W.3d at 448 (citations omitted).

When determining whether a race-neutral explanation was a pretext for purposeful discrimination, we examine whether comparative evidence demonstrates disparate treatment of minority veniremembers. *See Miller-El v. Dretke*, 545 U.S. 231, 241, 125 S. Ct. 2317, 2325 (2005). If a prosecutor's race-neutral reason for striking a minority veniremember applies equally to an otherwise similar non-minority veniremember whom the prosecutor does not challenge, this may be evidence that the race-neutral reason is a pretext for purposeful discrimination. *See id.*

We cannot, however, automatically impute disparate treatment in every case in which a reason for striking a minority veniremember also technically applies to a non-minority veniremember whom the prosecutor found acceptable. *See Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992), *cert. denied*, 509 U.S. 926 (1993). The decision to strike a particular potential juror is not susceptible to rigid qualification. *Id.* We must also look to the entire record to determine if, despite a similarity, there are any significant differences between the characteristics and responses of the veniremembers that would, under the facts of the case, justify the prosecutor treating them differently as potential members of the jury. *See Miller-El*, 545 U.S. at 247, 125 S. Ct. at 2329.

In *Miller-El*, the Supreme Court "considered the combined impact of a number of factors in concluding that, by clear and convincing evidence, the prosecutors exercised two peremptory challenges on a racially discriminatory basis, notwithstanding the race-neutral explanations they offered at the *Batson* hearing."

8

*Watkins*, 245 S.W.3d at 448 (citing *Miller-El*, 545 U.S. at 266, 125 S. Ct. at 2317). Those factors included (1) that the State had struck a higher percentage of African-Americans than non-African-Americans, (2) that the State's reasons for striking African-American jurors appeared to apply equally to non-African-American jurors whom the State did not strike, (3) that the State had used jury shuffles in a manner that supported an inference of racial discrimination, (4) that the State had questioned African-American and non-African-American jurors differently and in a way designed to obtain answers justifying strikes of African-American jurors, and (5) that the county in which Miller-El was prosecuted had a formal policy of excluding minority jurors from service. *Miller-El*, 545 U.S. at 240–64, 125 S. Ct. at 2325–39; *see Watkins*, 245 S.W.3d at 448–49.

### C. *Batson* Hearing

After the State exercised its strikes to the venire panel, Jackson's trial counsel raised a *Batson* challenge, arguing that the State had stricken the remaining three African-Americans from the venire panel. Although the record does not demonstrate the race of the veniremembers, we glean from the parties' arguments in the record and on appeal that five veniremembers were African-American; one was stricken for cause by agreement, one was stricken by Jackson because he was a Fort Worth police officer, and the remaining three—veniremembers 3, 4, and 14—were stricken

9

by the State.[2]   The trial court asked for the State's reasons for striking veniremembers 3, 4, and 14.

The State explained that it struck veniremember 3 because "she did not like the law of parties with regard to the non-shooter in a capital murder case, and that's very possibly an issue in this case."  The State explained that it struck veniremember 4 because she had written on her juror questionnaire that her brother is a drug dealer and because, during voir dire, she had agreed that the justice system is "sometimes" flawed and unfair and that she has felt isolated in the past.[3]  Finally, the State said it struck veniremember 14 because he had failed to disclose his prior arrest for credit card abuse and because he had stated in his jury questionnaire that he had several children but also that he was single.

The trial court found that the State had provided race-neutral reasons for striking veniremembers 3, 4, and 14, and it denied Jackson's *Batson* challenge.

On appeal, Jackson challenges only the trial court's denial of his *Batson* challenge regarding veniremember 3, claiming that the State did not strike another veniremember who was not African-American and who also expressed a similar opinion about the law of parties.  Jackson does not complain of the State's peremptory strikes of veniremembers 4 and 14 other than to assert that those strikes

---

[2]... There is some dispute in the record about whether a fourth veniremember, who ultimately sat on the jury, was Hispanic or African-American.

[3]... The State noted its belief that one of Jackson's defense theories at trial would be his isolation from the Como community.

show that the State exercised peremptory strikes disproportionally against African-American veniremembers.[4]

### D. Disproportionate Strikes Analysis

We initially note that the State used a disproportionate number of its peremptory strikes to exclude three of the four remaining African-American veniremembers the jury. Of the thirty-two veniremembers within the strike zone, four, or 12.5%, were African-Americans. The State used three, or 30%, of its ten peremptory challenges to strike 75% of the African-Americans on the venire panel. *See* Tex. Code Crim. Proc. Ann. art. 35.15(b) (providing for ten peremptory challenges in non-death penalty capital cases). Thus, the State used a statistically-disproportionate number of strikes on African-American veniremembers. *See* *Watkins*, 245 S.W.3d at 451 (noting that use of 55% of peremptory strikes to exclude 88% of black veniremembers was clearly disproportionate); *Leadon v. State*, Nos. 01-08-00839-CR, 01-08-00840-CR, 2010 WL 143467, at *11 (Tex. App.—Houston [1st Dist.] Jan. 14, 2010, no pet. h.) (holding State's use of 36.36% of strikes on 80% of black veniremembers was statistically disproportionate).

The disproportionality in the use of strikes may "support the appellant's ultimate burden of persuasion that the State's proffered race-neutral explanations

---

[4] Jackson's attorney explained during oral argument that he was not challenging the State's reasons for striking veniremembers 4 and 14, but he included in his brief an analysis of the State's stated reasoning for striking them to show discriminatory intent in striking veniremember 3.

are a sham." *Watkins*, 245 S.W.3d at 452. But, as the United States Supreme Court in *Miller-El* noted, a comparative analysis is "more powerful" than "bare statistics," and thus, we consider the State's proffered reason for striking veniremember 3. *See Miller-El*, 545 U.S. at 241, 125 S. Ct. at 2325.

### E. Comparative Juror Analysis of Veniremember 3

During voir dire, as the State was questioning the venire panel about the law of parties, the following exchange took place between the State and veniremember 3:

[State]: Okay. You think it would be unfair to charge Bill with capital murder if I'm the shooter at the bank, right?

[Veniremember 3]: Yes.

[State]: And just like I asked Mr. Hess the same question, would you have trouble following that part of the law if you're on the jury?

[Veniremember 3]: No, I don't have no trouble following.

[State]: But you disagree with it?

[Veniremember 3]: Yeah, I disagree with it, but I ain't heard the case.

[State]: Okay. Well, sure you haven't heard the facts, and I'm just talking about the hypothetical I told you about, okay?

[Veniremember 3]: Uh-huh.

[State]: And that is the law. Someone who's not the shooter in a capital murder, they can certainly be charged and found guilty, under the law, of capital murder, okay?
So you're—but you're saying . . . you disagree with that law, right?

[Veniremember 3]: Yeah, I do.

12

[State]: So you would have trouble following it if you were on the jury, right?

[Veniremember 3]: Yeah, I guess I would.

[State]: Well, let me ask you—I've got to pin you down—would you or would you not?

[Veniremember 3]: I would.

Jackson argues that the State treated veniremember 3 differently than a non-African-American on the panel, veniremember 21, because she also indicated that she could not agree with the law of parties but was ultimately seated on the jury. Jackson argues that the State "talked [veniremember 3] into saying she would have trouble" following the law but "had no trouble" accepting veniremember 21's assurance that she could follow the law. But unlike veniremember 3, veniremember 21 never indicated that she did not agree with the law of parties.[5] Thus, the State's reason for striking veniremember 3 did not apply to veniremember 21, and we cannot say that the State's persistent questioning of veniremember 3—after she had stated that she disagreed with the law of parties—was designed to evoke a certain response not elicited from veniremember 21. *See Watkins*, 245 S.W.3d at 449, 453–54 (citing *Miller-El*, 545 U.S. at 255–63, 125 S. Ct. at 2317).

---

[5] Jackson appears to argue that veniremember 21 raised her hand when the State asked the entire panel if anyone disagreed with the law of parties, but the record shows only that veniremembers 3, 13, 46, and 60 raised their hands. Veniremembers 46 and 60 were not within the strike zone and did not sit on the jury. The only other veniremember who expressed disagreement with the law of parties and who was within the strike zone was questioned extensively on his opinion, ultimately agreed that he could follow the law, but did not sit on the jury for reasons not revealed by the record.

Moreover, the State's explanation for striking veniremember 3 went unchallenged during the *Batson* hearing. Once the State proffered its race-neutral reason for striking veniremember 3, Jackson bore the burden to convince the trial court that the State's reason was not race-neutral. *See Ford*, 1 S.W.3d at 693; *see also Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002) ("[A] party's failure to offer any real rebuttal to a proffered race neutral explanation can be fatal to his claim."). Jackson did not cross-examine the State about the strike or offer any rebuttal or impeachment evidence tending to show that the State's reason was pretextual.[6]

For these reasons, we cannot say that the State's reason for striking veniremember 3 applied equally to veniremember 21 or was pretextual. *See Watkins*, 245 S.W.3d at 453–54; *Leadon*, 2010 WL 143467, at *14–15.

## F. Remaining Strikes on African-Americans

We will also examine the State's reasons for striking veniremembers 4 and 14 to determine whether those reasons provide evidence of the State's discriminatory intent. *See Watkins*, 245 S.W.3d at 448–49 (citing *Miller-El*, 545 U.S. at 241–52, 125 S. Ct. at 2317). The State said that it had struck veniremember 4 because her brother is a drug dealer, and her jury questionnaire shows that she in fact indicated that her brother had been arrested for selling drugs. Having a family member who

---

[6] When the trial court asked if defense counsel had any comment to the State's proffered reasons, defense counsel responded only that he was concerned with the State's reasoning for veniremember 4.

14

has been arrested or convicted is a race-neutral reason for striking a veniremember, and consequently, the State provided a race-neutral reason for striking veniremember 4. *See Simpson v. State*, 119 S.W.3d 262, 267–68 (Tex. Crim. App. 2003), *cert. denied*, 542 U.S. 905 (2004).

Jackson argues that the State did not strike other veniremembers who had family or close friends with prior convictions for driving while intoxicated, but drugs and dealing drugs were at issue in this case, not driving while intoxicated, and the State noted in its reasoning that Jackson's case involved many drug dealers. *See Beasley v. State*, 838 S.W.2d 695, 700 (Tex. App.—Dallas 1992, pet. ref'd) (holding prosecutor's reasons for striking potential jurors who had family members involved with drugs was race-neutral where appellant's case was drug-related), *cert. denied*, 114 S. Ct. 451 (1993). The State also reasoned that it struck veniremember 4 because she believed that the justice system is flawed; specifically, veniremember 4 commented, "[P]eople have done some things and gotten off." Jackson argues on appeal that veniremember 4's statement was actually a bias in favor of the State, but "the State may legitimately strike prospective jurors who appear to be unfavorable to the defense in ways that call into question their impartiality." *Johnson*, 68 S.W.3d at 650. Thus, the trial court could have reasonably found that the State did not have a discriminatory intent when it struck veniremember 4. *See Snyder*, 552 U.S. at 477, 128 S. Ct. at 1207; *Watkins*, 245 S.W.3d at 448.

15

Regarding veniremember 14, Jackson admits that veniremember 14's failure to disclose his prior criminal history "may well be a race neutral reason for striking him" but argues that the State's second reason—that veniremember 14 has children but is single—is not an appropriate reason to strike him. Regardless of the State's second reason, failure to disclose information during voir dire and personal involvement with the criminal justice system are race-neutral reasons to challenge a potential juror. *See Perry v. State*, 770 S.W.2d 950, 952–53 (Tex. App.—Fort Worth 1989, no pet.); *see also Holman v. State*, 772 S.W.2d 530, 533 (Tex. App.—Beaumont 1989, no pet.) (dismissing appellant's argument regarding one of State's reasons to strike potential jurors because failure to reveal criminal histories was State's "main or central reason" for exercising strikes). Thus, the trial court could have reasonably found that the State did not have a discriminatory intent when it struck veniremember 14. *See Snyder*, 552 U.S. at 477, 128 S. Ct. at 1207; *Watkins*, 245 S.W.3d at 448.

## G. Trial Court Not Clearly Erroneous

Reviewing the record as a whole and applying, as we must, great deference to the trial court's ruling, we cannot say that the trial court was clearly erroneous in overruling Jackson's *Batson* challenge. *See Watkins*, 245 S.W.3d at 448. Although the statistical analysis demonstrates that the State used a disproportionate number of peremptory strikes on African-Americans, our comparative analysis of veniremember 3 demonstrates that the State's reason for striking her was not

16

pretexual, and our analysis of the State's remaining strikes on African-American veniremembers does not demonstrate discriminatory intent. *See id.* at 448, 453–54. Accordingly, we overrule Jackson's first issue.

## IV. JURY ARGUMENT

In his second and third issues, Jackson argues that the State twice commented on his failure to testify during its closing argument at the guilt-innocence stage of trial and that the trial court erred by overruling both of his objections to the comments. Jackson claims that this error violated his state and federal constitutional rights against self-incrimination and article 38.08 of the code of criminal procedure. *See* U.S. Const. amend V; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 38.08 (Vernon 2005).

### A. The Complained-Of Comments

During its closing arguments, the State argued that Jackson's alibi witnesses had lied on the witness stand. The State then stated,

> And [Jackson's alibi witnesses] testified that [Jackson] was with them after [six] o'clock all night long. That's what the testimony was.
>
> But the defendant didn't know that we knew he went back to the scene, so he had to shift gears a little bit. And now all of a sudden, he went back to the scene. Yes, he admits he was there. "I was there, but if I was there"—

Jackson objected that this was an improper comment on his failure to testify, to which the State replied, "Defense counsel, Your Honor, is who I'm referring to." The trial court overruled the objection. The State continued, "This is what it comes down

17

to. You heard the testimony on Friday. You know they were lying, okay? And if he's going to get them to come here and lie to you, it's because he is guilty of the offense."

Later in its closing argument, the State argued,

And their defense theory about Como turning [Jackson] in was shot out of the water on day two. And now Friday afternoon to Monday morning, the alibi witnesses that we called up here were shot out of the water. That is not true.

If he was going to lie to you about that, then he's guilty of capital murder.

Jackson again objected that this was a comment on his failure to testify, and the trial court overruled his objection.

## B. Law on Comment on Failure to Testify

A comment on an accused's failure to testify violates the accused's state and federal constitutional privileges against self-incrimination. *Moore v. State*, 849 S.W.2d 350, 351 (Tex. Crim. App. 1993); *Smith v. State*, 65 S.W.3d 332, 339 (Tex. App.—Waco 2001, no pet.). In addition, the code of criminal procedure provides that a defendant's failure to testify on his own behalf may not be held against him and that counsel may not allude to the defendant's failure to testify. Tex. Code Crim. Proc. Ann. art. 38.08.

To determine whether a comment violates a defendant's right against self-incrimination or article 38.08, we must decide whether the language used was manifestly intended or was of such a character that the jury naturally and necessarily

18

would have considered it to be a comment on the defendant's failure to testify. *See Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001); *Fuentes v. State*, 991 S.W.2d 267, 275 (Tex. Crim. App.), *cert. denied*, 528 U.S. 1026 (1999). The offending language must be viewed from the jury's standpoint, and the implication that the comment referred to the accused's failure to testify must be clear. *Bustamante*, 48 S.W.3d at 765; *Swallow v. State*, 829 S.W.2d 223, 225 (Tex. Crim. App. 1992). A mere indirect or implied allusion to the defendant's failure to testify does not violate the accused's right to remain silent. *Wead v. State*, 129 S.W.3d 126, 130 (Tex. Crim. App. 2004); *Patrick v. State*, 906 S.W.2d 481, 490–91 (Tex. Crim. App. 1995), *cert. denied*, 517 U.S. 1106 (1996). A statement referencing evidence that can come only from the defendant is, however, a direct comment on the defendant's failure to testify. *Goff v. State*, 931 S.W.2d 537, 548 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1171 (1997); *Madden v. State*, 799 S.W.2d 683, 700 (Tex. Crim. App. 1990), *cert. denied*, 499 U.S. 954 (1991).

### C. State Did Not Comment on Jackson's Failure to Testify

In the instant case, a review of Jackson's defensive theory and closing argument provides some insight into the complained-of comments made by the State in its closing argument. At trial, Jackson called Brandi Hawkins and Andre Hawkins to testify on his behalf. Brandi is the mother of Jackson's girlfriend, and Andre is the brother of Jackson's girlfriend. Both testified that Jackson was at their house the entire evening of Witt's murder and that Jackson had slept there that

19

night.  On cross-examination, Brandi admitted that Jackson had sent her a handwritten affidavit to sign, stating that Jackson was at her house on the night of Witt's murder.  In rebuttal, the State called two witnesses to testify that they had seen Jackson in the crowd of bystanders at Witt's house after Witt's murder, contradicting Brandi's and Andre's testimony.  During defense counsel's closing argument, he addressed the State's rebuttal and said that Brandi Hawkins's testimony was discredited.  He argued,

> But I'm not going to stand in front of you and argue that Joemar Jackson didn't go to [Witt's] house.  I believe he did.

> But if he went to the house, his interest in this is no different than the interest of everybody else at the house about what happened.

When the State commented later in its closing argument that Jackson "admits he was there [at Witt's house after the murder].  'I was there, but if I was there,'" the State was clearly addressing defense counsel's closing argument, not any failure to testify on Jackson's part.[7]  The State's comment was also addressing Jackson's defensive theory and the impeachment of his alibi witnesses.  This same reasoning applies to the second complained-of argument—that Jackson had lied about his alibi

---

[7]... Jackson emphasizes the State's use of the word "I," but "[w]hat determines the impermissibility of a reference to the defendant's failure to testify is not the use of 'I' or 'he' or 'she' or any other word, but rather the entirety of the prosecutor's statements, taken in the context in which the words were used and heard by the jury." *Cruz v. State*, 225 S.W.3d 546, 549 (Tex. Crim. App. 2007); *but see Cherry v. State*, 507 S.W.2d 549, 550 (Tex. Crim. App. 1974) ("[W]hen the word 'I' is used in reference to something the defendant might have testified to, but did not, it is illogical to think that the jury is not reminded of the defendant's failure to testify.").

defense. The State was summarizing the evidence and addressing testimony from Jackson's alibi witnesses and the fact that Jackson had written affidavits for them to sign, stating that he was with them on the night of Witt's murder. *See Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992) (noting that proper jury argument includes summations of evidence, reasonable deductions from evidence, and answers to argument of opposing counsel), *cert. denied*, 510 U.S. 829 (1993).

Viewing the State's comments from the jury's standpoint, we hold that the complained-of comments did not naturally and necessarily refer to Jackson's failure to testify; rather, they were proper comments on Jackson's defensive theory and testimony from his alibi witnesses and were answers to defense counsel's arguments. *See Bustamante*, 48 S.W.3d at 765; *Smith*, 65 S.W.3d at 339 (holding that State's comments were critiques of the amount of evidence defendant put forth on his defensive theory, not comments on failure to testify); *see also McKay v. State*, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985) (concluding prosecutor's statement that "there is no evidence to that effect" and "there is no evidence of any phantom [killer]" was not improper reference to defendant's failure to testify but was invited by counsel's argument that someone else had committed the murder), *cert. denied*, 479 U.S. 871 (1986); *Edmond v. State*, 566 S.W.2d 609, 611 (Tex. Crim. App. [Panel Op.] 1978) (construing prosecutor's closing argument as proper comment on appellant's defensive theory). The complained-of comments were not manifestly intended or of such a character that the jury naturally and necessarily would have

21

considered them to be comments on Jackson's failure to testify. *See Bustamante*, 48 S.W.3d at 765; *Fuentes*, 991 S.W.2d at 275.

## D.  Alternatively, Any Error Was Harmless

Alternatively, even assuming the State's arguments were comments on Jackson's failure to testify, we conclude any error in the trial court's overruling Jackson's objections was harmless. *See* Tex. R. App. P. 44.2(a); *see Wimbrey v. State*, 106 S.W.3d 190, 192 (Tex. App.—Fort Worth 2003, pet. ref'd).  Under Texas Rule of Appellate Procedure 44.2(a), upon determining constitutional error exists, we should reverse unless we determine beyond a reasonable doubt that the error did not contribute to the defendant's conviction or punishment.  Tex. R. App. P. 44.2(a). Our primary inquiry is what effect the error had, or reasonably may have had, on the jury's decision. *Wimbrey*, 106 S.W.3d at 193.  "We consider the source and nature of the error, the extent that it was emphasized by the State, its probable collateral implications, the weight a juror would probably place on the error, and whether declaring it harmless would likely encourage the State to repeat it with impunity." *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).

As we explained above, a review of the State's entire argument, Jackson's closing argument, and Jackson's defensive theories reveals that the State was referring to testimony elicited from Jackson's alibi witnesses and defense counsel's closing argument.  Our neutral, impartial review of the record further demonstrates that the comment was a small part of the State's argument and was not emphasized

22

or mentioned again and that the jury likely did not attribute much, if any, weight to the error. *See id.* Although the trial court overruled Jackson's objections, the court read its charge to the jury prior to closing arguments. The charge included an instruction not to consider Jackson's failure to testify, and the jury is presumed to follow this instruction. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998).

After carefully reviewing the record and performing the harm analysis required under rule 44.2(a), we alternatively hold that if the trial court erred by overruling Jackson's objection to the State's comments at issue, then beyond a reasonable doubt, such error did not contribute to Jackson's conviction or punishment. *See* Tex. R. App. P. 44.2(a). We overrule Jackson's second and third issues.

## V. HEARSAY STATEMENTS

In his fourth and fifth issues, Jackson complains of hearsay statements made by Clark at trial. We will address each of his complaints separately below.

### A. Clark's Testimony

Clark testified that, on the night of Witt's murder, she and Francis were in a car together, that she could tell something was wrong with him, and that she had asked Francis what had happened. The State then asked Clark, "What did he tell you?" Defense counsel raised a hearsay objection, and after a discussion off the record, defense counsel withdrew his objection. Clark then testified, "He said, 'I didn't do it. [Jackson] did it.'" Outside the jury's presence, defense counsel

23

explained that he had withdrawn the objection because the State had told him that Clark's answer would be that Francis did not tell her anything. The State agreed to withdraw the question. When the jury returned, the trial court instructed it to disregard the State's last question and Clark's answer. The trial court denied Jackson's request for a mistrial.

The State then asked Clark about a conversation she had with Francis while he was taking a bath the night of Witt's murder. She testified, over Jackson's running hearsay objection, that Francis had told her that after he, Phillips, Baldwin, and Jackson robbed Witt, Jackson shot Witt in the back of the head. Clark explained that Francis was crying "[a] lot" while telling her about the robbery.

### B. Motion for Mistrial

In his fourth issue, Jackson argues that the trial court erred by refusing to grant a mistrial after Clark testified that Francis "said, 'I didn't do it. [Jackson] did it.'"

We review whether the trial court erred in denying a motion for mistrial under an abuse of discretion standard. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000). A trial court does not abuse its discretion when its decision is within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). Absent an abuse of discretion, we do not reverse a trial court's denial of a mistrial. *Ladd*, 3 S.W.3d at 567.

24

Granting a mistrial is an extreme remedy for curing prejudice that occurs during a trial. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). A mistrial is required only when the improper evidence or testimony is "clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on the minds of the jury." *Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999). A trial court should grant a mistrial only when it is apparent that an objectionable event at trial is so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant. *Bauder v. State*, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996), *overruled on other grounds by Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007). Ordinarily, a prompt instruction to disregard will cure any prejudicial effect associated with improper testimony. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). A reviewing court should presume the jury followed the trial court's instructions to disregard improper testimony. *Colburn*, 966 S.W.2d at 520.

In this case, by the time that Clark testified about what Francis had said in the car, the jury had already heard Francis testify that Jackson was the shooter and that Francis had told Clark what had happened, as well as Hall's testimony that Jackson had admitted to shooting Witt. Thus, the harm from Clark's testimony was attenuated by the fact that the jury had already twice heard essentially the same evidence. *See Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986)

25

("Inadmissible evidence can be rendered harmless if other evidence at trial . . . proves the same fact that the inadmissible evidence sought to prove."); *Couchman v. State*, 3 S.W.3d 155, 160–61 (Tex. App.—Fort Worth 1999, pet. ref'd). Moreover, in the absence of evidence to the contrary, we presume that the jury followed the trial court's instructions to disregard Clark's testimony. *See Colburn*, 966 S.W.2d at 520. The testimony at issue was not so emotionally inflammatory that the trial court's curative instruction did not prevent the jury from being unfairly prejudiced against Jackson. *See Bauder*, 921 S.W.2d at 698. Thus, we hold that the trial court did not abuse its discretion when it denied Jackson's motion for mistrial, and we overrule Jackson's fourth issue. *See Ladd*, 3 S.W.3d at 567; *Montgomery*, 810 S.W.2d at 391.

### C. Objection to Further Hearsay

In his fifth issue, Jackson argues that the trial court erred by overruling his hearsay objection after Clark testified that, while Francis was taking a bath, he had told her that Jackson had shot Witt. The State argues that the statement was admissible as an excited utterance and that, alternatively, any error was harmless.

We need not decide whether this testimony was admissible as an excited utterance because, even assuming error, any error was harmless. Erroneously admitted evidence is a violation of evidentiary rules and thus non-constitutional error. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We apply rule 44.2(b) and disregard the alleged error if it did not affect Jackson's substantial rights.

26

Tex. R. App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999); *Coggeshall v. State*, 961 S.W.2d 639, 642–43 (Tex. App.—Fort Worth 1998, pet. ref'd). In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley*, 983 S.W.2d at 259.

As we noted above, an error in the admission of a hearsay statement is harmless if other unobjected-to evidence is admitted at trial that proves the same fact. *Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991); *Anderson*, 717 S.W.2d at 628; *Franks v. State*, 90 S.W.3d 771, 805 (Tex. App.—Fort Worth 2002, no pet.); *Matz v. State*, 21 S.W.3d 911, 912–13 (Tex. App.—Fort Worth 2000, pet. ref'd); *Couchman*, 3 S.W.3d at 160–61. Thus, Francis's unobjected-to testimony that Jackson was the shooter and that Francis had told Clark what had happened, Phillips's unobjected-to testimony that Jackson was the shooter, and Hall's and Amos's unobjected-to testimony that Jackson had admitted to being the shooter rendered harmless any error in admitting Clark's testimony. *See* Tex. R. App. P. 44.2(b); *see Mosley*, 983 S.W.2d at 259. We overrule Jackson's fifth issue.

### VI. JURY CHARGE

In his sixth issue, Jackson argues that the trial court erred by failing to include an accomplice-witness instruction in the jury charge. Jackson acknowledges that his defense counsel did not object to the exclusion of the accomplice-witness

27

instruction, but he argues that he suffered egregious harm as a result of the trial court's error.

## A. Standard of Review

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). Initially, we must determine whether error occurred. If it did, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Abdnor*, 871 S.W.2d at 731–32.

If there is error in the court's charge but the appellant did not preserve it at trial, we must decide whether the error was so egregious and created such harm that the appellant did not have a fair and impartial trial—in short, that "egregious harm" has occurred. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 2006); *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008); *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). Egregious harm is the type and level of harm that affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Allen*, 253 S.W.3d at 264 & n.15; *Olivas v. State*, 202 S.W.3d 137, 144, 149 (Tex. Crim. App. 2006); *Almanza*, 686 S.W.2d at 172.

In making an egregious harm determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any

other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *see generally Hutch*, 922 S.W.2d at 172–74. The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174. Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002); *Hutch*, 922 S.W.2d at 171.

### B. Accomplice-Witness Instruction

Article 38.14 of the code of criminal of procedure provides, "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005). A prosecution witness "who is indicted for a lesser included offense based upon alleged participation in commission of the greater offense is also an accomplice as a matter of law." *Ex parte Zepeda*, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991). If a prosecution witness is an accomplice as a matter of law, the trial court is under a duty to instruct the jury accordingly, and failure to do so is error. *Herron v. State*, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002).

The instruction does not require the jury to be skeptical of accomplice-witness testimony or to give less weight to such testimony than to other evidence. *Id.* The instruction merely informs the jury that it cannot use the accomplice-witness

testimony unless some non-accomplice evidence connects the defendant to the offense. *Id.*

The test for sufficient corroboration is whether, after excluding the accomplice's testimony, other evidence of an incriminating character tends to connect the defendant with the commission of the offense. *Burks v. State*, 876 S.W.2d 877, 887 (Tex. Crim. App. 1994), *cert. denied*, 513 U.S. 1114 (1995); *Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993). Corroborating evidence need not directly connect the defendant to the crime or be sufficient by itself to establish guilt; instead, the combined weight of the corroborating evidence need only tend to connect the defendant to the offense. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000); *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App.), *cert. denied*, 522 U.S. 844 (1997). Additionally, the corroborative evidence may be circumstantial or direct, and the accomplice testimony need not be corroborated on every element of the offense. *Brosky v. State*, 915 S.W.2d 120, 138 (Tex. App.—Fort Worth, pet. ref'd), *cert. denied*, 519 U.S. 1020 (1996).

Non-accomplice evidence can render harmless a failure to submit an accomplice-witness instruction by fulfilling the purpose an accomplice-witness instruction is designed to serve. *Herron*, 86 S.W.3d at 632. The omission of an accomplice-witness instruction is generally harmless under the egregious harm standard unless the corroborating non-accomplice evidence is "'so unconvincing in

fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Id.* (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)).

### C. No Egregious Harm

Here, Jackson was indicted for and convicted of capital murder for killing Witt in the course of committing or attempting to commit robbery. *See* Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2009). Francis testified that he had been charged with consipiracy to commit robbery for his participation in this crime, and Phillips testified that he had been charged with capital murder for his participation in the crime; consequently, they were accomplices as a matter of law, and the trial court erred by not including the accomplice-witness instruction in the jury charge. *See Zepeda*, 819 S.W.2d at 876. We must consider whether Jackson suffered egregious harm as a result of this error. *See Herron*, 86 S.W.3d at 631.

The non-accomplice evidence in this case consisted of (1) Hall's testimony that he had overheard Jackson telling a neighbor that he hoped Phillips could "hold water" and would not "snitch" on him and saying that he should have "murked" Phillips; (2) Coleman's testimony that Phillips had told him about the robbery and that Jackson was the shooter; (3) Amos's testimony that both Phillips and Jackson had told him that Jackson was the shooter; (4) Clark's testimony that she had heard Phillips tell Francis that he and Jackson saw a lot of drugs and money at Witt's house and wanted to rob Witt and that Francis had told her about the robbery and

31

that Jackson shot Witt during the robbery; and (5) Porter's and Witt's cousin's testimony that they had seen Jackson at the crime scene after Witt's murder, contradicting the testimony of Jackson's alibi witnesses.

Jackson argues that Clark's and Coleman's only knowledge of Jackson's involvement in the crime came from his accomplices, Phillips and Francis. Jackson admits that Hall and Amos offered corroborating testimony, but he argues that they are "individuals of questionable veracity" and that Jackson's alleged admissions to Hall and Amos were ambiguous.

Nevertheless, we cannot say that the corroborating (non-accomplice) evidence was not "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Herron*, 86 S.W.3d at 632 (quoting *Saunders*, 817 S.W.2d at 692). The non-accomplice evidence need not prove all the elements of the alleged offense or directly link Jackson to the commission of the offense; rather, it is sufficient if it tends to connect him to the offense. *See Cathey*, 992 S.W.2d at 462; *Brosky*, 915 S.W.2d at 138. After excluding the accomplice testimony, we find that the combined weight of the corroborating evidence—even absent Clark's and Coleman's testimony—sufficiently tends to connect Jackson to the robbery and Witt's murder. *See Cathey*, 992 S.W.2d at 462; *Brosky*, 915 S.W.2d at 138.

Accordingly, we hold that the trial court's error in failing to include an accomplice-witness instruction in the jury charge did not result in egregious harm to

32

Jackson such that he did not have a fair and impartial trial. *See* Tex. Code Crim.

Proc. Ann. art. 36.19; *Allen*, 253 S.W.3d at 264; *Hutch*, 922 S.W.2d at 171; *Almanza*,

686 S.W.2d at 171. We overrule Jackson's sixth issue.

## VII. CONCLUSION

Having overruled Jackson's six issues, we affirm the trial court's judgment.


PER CURIAM


PANEL: WALKER, LIVINGSTON, and GARDNER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 15, 2010